Helen A. PENA, Appellee,

v.

BRATTLEBORO RETREAT, Appellant.

No. 624, Docket 82–7598.

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1983.

Decided March 1, 1983.

David A. Gibson, Brattleboro, Vt. (Weber, Perra & Gibson, Brattleboro, Vt., of counsel), for appellant.

Peardon Donaghy, Barre, Vt. (Abare, Donaghy & Nicholls, P.C., Barre, Vt., of counsel), for appellee.

Before KEARSE, WINTER and PRATT, Circuit Judges.

WINTER, Circuit Judge:

Brattleboro Retreat appeals from a jury verdict and a judgment for $30,000 in damages entered in favor of Helen A. Pena after a two day trial before Judge Coffrin in the United States District Court for the District of Vermont. Pena claimed that the Retreat, her former employer, had violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (1976, Supp. IV 1980 & Supp. V 1981) in discharging her. The Retreat contends that Judge Coffrin erred in denying its motions for a directed verdict after the plaintiff's case in chief and for a judgment notwithstanding the verdict. Because we agree that the evidence presented by Pena did not establish a *prima facie* case under the ADEA, we reverse.

I

The Brattleboro Retreat is a psychiatric hospital which provides allied services including those of a nursing home known as

Linden Lodge. In January, 1975, after discussions with Dr. William Beach, Chief Executive Officer of the Retreat, Mrs. Pena, then 58 years old, was hired to serve as coordinator of the various functions and services offered by the Retreat, reporting directly to Dr. Beach. Mrs. Pena was promoted in stages to the position of administrator of Linden Lodge, a position she held until 1980. Mrs. Pena was responsible for supervising the day to day operations of Linden Lodge, including its employees and staff, for maintaining communications with various state and federal oversight and funding agencies, and for lobbying efforts on behalf of the Retreat involving the Vermont state government. She was considered particularly adept at dealing with agency regulations and at acting as an advocate for the hospital in government circles.

Mrs. Pena suggested, apparently in the spring of 1978, that someone be trained to take over her position after her planned retirement in August, 1981. As a consequence, and on Mrs. Pena's recommendation, a woman in her early thirties named Mary Horan was hired as an assistant administrator for the Lodge.

At trial, Mrs. Pena, as the sole witness on her behalf, contended that a February 13, 1980 meeting was the first in a series of events which constituted a constructive discharge from her position as administrator of Linden Lodge, and that because she was replaced by a younger woman, Mary Horan, her discharge was due to her age. The Retreat claimed that Mrs. Pena resigned due to her own inability to adjust to the reasonable demands of her employer and that the parting of the ways between Mrs. Pena and the Lodge was unrelated to age. After the conclusion of the Retreat's case, the jury returned a verdict in favor of Mrs. Pena and a damage award for $24,153.75 plus twenty-five percent for fringe benefits plus full pension benefits, which the Court found to be inconsistent and to contain a gratuity. Judge Coffrin therefore set aside the damage award and recomputed the damages to the sum of $30,000, a figure to which both parties agreed.

## II

The Supreme Court has stated, regarding motions for directed verdicts and judgments n.o.v.,

> When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding ... without submission to the jury .... By such direction of the trial court the result is saved from the mischance of speculation over legally unfounded claims.

*Brady, Administratrix v. Southern Railway Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943). The standard in this circuit is whether "the evidence, viewed in the light most favorable to the non-movants without considering credibility or weight, reasonably permits only a conclusion in the movants' favor." *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 573 (2d Cir.1982); *Samuels v. Health and Hospitals Corp.,* 591 F.2d 195, 198 (2d Cir.1979); *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970).

Pena's action was brought under the ADEA which provides that it "shall be unlawful for an employer ... to discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). However, the Act specifically provides that it is not unlawful for an employer to base its decision on "reasonable factors other than age," or to discharge an individual "for good cause." 29 U.S.C. § 623(f)(1)(3).

The plaintiff has the burden of proving that "age was the 'determining factor' in his discharge in the sense that, 'but for' his employer's motive to discriminate against him because of age, he would not have been discharged." *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1019 (1st Cir.1979). The standards relating to burden and order of proof in Title VII cases apply as well to cases arising under the ADEA. *See e.g., Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978); *Geller v. Markham,* 635 F.2d 1027 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68

L.Ed.2d 332 (1981); *Loeb v. Textron, supra.* Those standards were most recently enunciated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), in which the Court explained:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

(citations omitted).

■ Given the nature of Mrs. Pena's claim, a *prima facie* case of age discrimination would consist of sufficient evidence to support a finding that (i) she was in the protected age group, (ii) she was qualified for her job, (iii) she was discharged, and (iv) the discharge occurred in circumstances which give rise to an inference of age discrimination. *Id.*

We hold that Mrs. Pena failed to produce evidence that she was discharged. She did not, therefore, establish a *prima facie* case and a verdict in favor of the defendant should have been directed at the close of her case in chief.[1] Mrs. Pena's testimony, the only evidence offered in her behalf, was to the following effect: On February 13, 1980, she and Dr. Beach held their regular Tuesday meeting. Dr. Beach began it with the rather blunt statement, "Helen, I would like you to step down." When Mrs. Pena failed to respond, he added, "I would like Mary Horan to take over the running of the day-to-day of Linden Lodge. I would like her to learn from you." He then further explained that, "You know there comes a time for all of us to relinquish responsibility." Mrs. Pena's testimony made it clear that she understood this to mean not that her employment ties with Linden Lodge and the Retreat should be severed, but rather that she should serve as backup to Mary Horan so Horan might obtain comprehensive experience in running the home while Pena was still available to help her. Indeed, Dr. Beach said that it was important to delegate authority to subordinates and made it clear that Mrs. Pena would retain the title of administrator of Linden Lodge and would continue to supervise Ms. Horan's work during this period. Moreover, the understanding was that Mrs. Pena would continue to receive the same salary she had been receiving all along.

Mrs. Pena described her reaction to this suggestion in the following way: "[t]he [delegation of authority] is what he was expecting, apparently. But it came as a shock." When she asked Dr. Beach what her role was to be in the new order of things, he stated, "You can do your own thing." She interpreted this to mean that she would serve as administrator "without any authority. Mary was to run the Lodge, and I was to be on the road and do legislative work, whatever I wanted to do." The difficulty with this, according to Mrs. Pena, was that the legislature was only in session a few months a year and that much of the time she would have little to do, despite the fact that she would still have extensive duties as governmental agency liaison for the Retreat. Thus, as Mrs. Pena stated, "I couldn't work without a role .... I didn't have a role. The facility was too small to have two administrators. To my staff I was the administrator. When I was there it was too confusing for the staff and the patients. That was my problem."

After the February 13 meeting, Mrs. Pena went back to Linden Lodge and first told Mary Horan and then the rest of the staff that she was going to resign her position. As she recalled, "After that meeting,

---

1. We have examined the evidence offered by the defendant and have found nothing which bolsters Mrs. Pena's claim. To the contrary, the defendant's evidence further exposes the fatal infirmities in her case in chief.

I went over. I was still in that emotional state, and I said to my staff, 'I am leaving.'" At trial, Mrs. Pena explained these actions by saying, "I was so emotionally disturbed at the time, and being a psychiatric facility they surely should understand it, that I cannot be responsible for what I said." During the next two weeks or so, William Stearns, the defendant's director of employee relations, attempted to dissuade Mrs. Pena from resigning just as Mary Horan had in fact attempted to do earlier. And, indeed, Mrs. Pena herself began to think that she could work things out, despite the fact that she had decided on her own initiative to move her desk out of the administrator's office and into the ward.

Although the exact date is somewhat confused, sometime during the week of February 25, Mrs. Pena met once again with Dr. Beach, this time in the presence of Horan and Stearns. Mrs. Pena testified that the meeting was "so horrendous, Dr. Beach was in a chair and he turned his back to me. He addressed everything to Mary Horan.... I was treated as if I were not in the room .... I had to walk out. I was so depressed .... So if this was how I was to be treated as Administrator, I just couldn't take it and I walked out of the room. And as I walked out Dr. Beach did too. I think he was as upset as I was." Despite this outburst, Dr. Beach continued to discuss with Mrs. Pena various ways in which she might expand her contemplated role in the operation of the Retreat. Thus, Mrs. Pena suggested that she act as consultant to the Retreat's new geriatric unit. After consideration, however, Dr. Beach rejected these suggestions on the ground that Mrs. Pena had been having trouble working with the staff, and in particular with Mary Horan. Indeed, it was not until April 2, 1980, that Mrs. Pena formally submitted her resignation. During the interim, she was apparently away from the retreat using accrued vacation time.

Taking her own testimony in the light most favorable to her, it is quite clear that Mrs. Pena has proven neither an explicit nor a constructive discharge. Her own understanding throughout the relevant period was that Dr. Beach wished her to remain with the Retreat, albeit in a somewhat different role as a supervisor of delegated authority. At issue was the relative role of Mrs. Pena and her chosen successor, Mary Horan. Ms. Horan had been hired because Mrs. Pena planned to retire, and all agreed that a new person must be trained. Mrs. Pena's testimony is riddled with evidence that she thereafter refused to give Ms. Horan meaningful responsibility or to delegate or share duties with her. Mrs. Pena emphasized that the responsibilities of administration were not so burdensome as to afford Ms. Horan full time work unless such a delegation took place. It was Mrs. Pena's strongly held view that this delegation should await the moment she had chosen. Her employer felt a different time was appropriate. In response, she resigned.

A constructive discharge occurs when the employer, rather than acting directly, "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Young v. Southwestern Savings and Loan Assn.*, 509 F.2d 140, 144 (5th Cir.1975). In determining whether or not a constructive discharge has taken place, "the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977); *accord, Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61 (5th Cir.1980). The Retreat's treatment of Mrs. Pena cannot even remotely be described as intolerable. Mrs. Pena was simply asked to train her successor for a year and a half, rather than for the six months she herself envisioned. This was no more than a change in job responsibilities based on a reasonable business decision on the part of the Retreat which was paying Ms. Horan to learn Mrs. Pena's job. Mrs. Pena was faced with no loss of pay or change in title. Mrs. Pena herself recognized the need to train Mary Horan to take over as administrator and had caused the Retreat to hire Horan and have her in place pending Pena's planned retirement. The

**326**

disagreement was simply over when to begin that training, with Mrs. Pena insisting on her timing rather than Dr. Beach's. No reasonable person would have found this a compulsion to resign, particularly when members of the administration were asking her to stay on as a general supervisor of Ms. Horan's work with leeway to pursue her own interest in nursing home-agency relations.

Mrs. Pena's case in chief proved only that she strongly disagreed with the business judgments of the Retreat and now seeks compensation for the consequences of her own acts. For example, her complaint stresses that she had no offices in the Lodge as an element of alleged intolerable working conditions. Her own testimony, however, was that she voluntarily moved from the office shared with Ms. Horan. Similarly, her declarations that she intended to resign began immediately after her February 13 meeting with Dr. Beach and amply reflect her overreaction to a reasonable business decision of her employer. The ADEA does not protect employees who resign in protest against business decisions of this type and the motion for a directed verdict at the close of the plaintiff's case in chief should have been granted.

Reversed.