995 F.2d 1147
 62 Fair Empl.Prac.Cas. (BNA) 151,
61 Empl. Prac. Dec. P 42,277
Erwin J. SPENCE, Jr., Plaintiff-Appellant,
v.
MARYLAND CASUALTY COMPANY, American General Corporation,
Thomas K. Fitzsimmons, and William B. Loden,
Defendants-Appellees.
 No. 1372, Docket 92-9052.
 United States Court of Appeals,
Second Circuit.
 Argued April 23, 1993.
Decided May 26, 1993.
 
 Christopher A. Spence, Buffalo, NY (Magner, Love & Morris, on the brief), for plaintiff-appellant.
 Thomas S. Gill, Buffalo, NY (Saperston & Day, on the brief), for defendants-appellees.
 Before: KEARSE and ALTIMARI, Circuit Judges, and CARTER, District Judge*.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Erwin J. ("Jack") Spence, Jr., appeals from a judgment entered in the United States District Court for the Western District of New York, William M. Skretny, Judge, dismissing his complaint against defendants Maryland Casualty Co. ("Maryland Casualty" or the "Company") et al., seeking monetary relief principally for an alleged constructive discharge in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634 (1988), and state law. The district court granted defendants' motion for summary judgment on the ground that Spence had failed to meet his burden of establishing by a preponderance of the evidence that defendants' reasons for their actions toward him were merely a pretext for age discrimination. On appeal, Spence contends principally that the existence of genuine issues of fact as to defendants' motivation precluded summary judgment and that the district court erred in denying certain discovery requests. For the reasons below, we affirm the judgment principally on the ground that there was no proof of constructive discharge.
 
 I. BACKGROUND
 
 2
 Maryland Casualty is an insurance company headquartered in Baltimore, Maryland. Spence began working at Maryland Casualty upon his graduation from college in 1950 and, with one interruption, continued to work there for more than 35 years. Most of the description that follows is taken from Spence's own account of the events and his reactions to them, as recited in deposition testimony and in an affidavit filed in this action.
 
 A. The Events
 
 3
 In 1977, Spence became manager of the Company's Buffalo, New York branch. He apparently had no difficulty in that position before 1987, succeeding in increasing the volume of premiums received by that office from $5 million in 1977 to $39 million by the end of 1987. In 1987, the Company's profit goal for the Buffalo branch was approximately $1.5 million; under Spence's management, the office produced profits of more than $3.5 million.
 
 
 4
 In 1985, defendant William B. ("Rick") Loden, a Maryland Casualty vice president, became supervisor of branch managers for the Company's Mid-Atlantic region. He reported to defendant Thomas K. Fitzsimmons, who was then vice president for that region. In early 1987, Spence, then 58 years old, began to receive criticism of his management of the Buffalo branch from Loden, apparently with the concurrence of Fitzsimmons. In the spring of 1987, Loden conducted a review of the Buffalo branch and was displeased both with the reports he received and with the manner in which branch staff members had prepared themselves for the review. Loden told Spence he held Spence responsible for the poor performance of the staff. Though Loden had changed the format for these reviews unbeknownst to Spence, he blamed Spence for not having learned of the change. Spence learned that other branches had been similarly criticized.
 
 
 5
 In June 1987, Loden visited the Buffalo office, accompanied by another Maryland Casualty executive. At their meeting, Loden harangued Spence and his staff, and the other executive pounded his fist on the table. The gist of their complaints was
 
 
 6
 you're always recommending things that we can't do, why don't you try to do something else? Why don't you come up with some other suggestions and why don't you follow through on certain other things
 
 
 7
 ....
 
 
 8
 (Deposition of Erwin J. Spence, Jr. ("Spence Dep."), July 7, 1989, at 40.) Spence viewed the executives' conduct as intimidating and especially harassing, given the unprofessional pounding on the table. Thereafter, Loden sent Spence a letter outlining problems facing the Buffalo branch and again indicating that Loden was dissatisfied with Spence's performance in directing his staff. Spence regarded this letter as intimidating and threatening.
 
 
 9
 In July 1987, Loden met with Spence again and criticized his management style as unduly soft. Spence argued that the way in which he had always managed people was to persuade and motivate, rather than to intimidate. Loden was unpersuaded:
 
 
 10
 ... LODEN told me that changes over my 35 year tenure with the company mandated that I change my management style. He told me he wanted me to "kick people in the ass, as I do it". I told him that my management style had been approved by the company for 35 years and I had been successful in motivating my personnel with my own management style. LODEN told me that to continue with the company under him, I must change my management style to become more like his own. He told me that because of my age, he knew it would be difficult for me to conform to his wishes. Nevertheless, that would be required as part of my employment.
 
 
 11
 (Affidavit of Erwin J. Spence, Jr., dated February 14, 1992 ("Spence Aff."), p 14.) Spence considered Loden's statements to be threatening and intimidating.
 
 
 12
 In September 1987, Loden sent Spence a letter complaining of an August shortfall in production at the Buffalo branch. Loden blamed Spence's management policies for the shortfall. Spence considered the letter harassing because of its "tone" that implied, "you're in trouble again." (Spence Dep. July 7, 1989, at 63.)
 
 
 13
 In the fall of 1987, Spence noticed that reports from Company headquarters were slow to reflect certain premiums received by the Buffalo branch. He therefore instructed his administrative manager to send all premium recordings to headquarters by Federal Express. Fitzsimmons criticized him for use of Federal Express. Spence considered this criticism to be intimidating or threatening.
 
 
 14
 In November 1987, Loden met in Buffalo with Spence and his office managers and told them their performance was unsatisfactory, accusing the participants of blaming each other for the branch's shortcomings. The meeting included a five-minute tirade by Loden, who ranted and cursed and
 
 
 15
 stated that if he had to come back to Buffalo one more time, that he would remove me as manager and that he will, indeed, remove the entire management staff of the Buffalo office.
 
 
 16
 (Id. at 72.) Loden said, "I will come up and fire you, Spence, and every other member of your management team that's in this room. Starting with you...." (Id. at 76.) After Loden "left the room in a rage" (Spence Aff. p 23), Spence's managers, shaken by this performance, asked Spence whether they should look for other jobs.
 
 
 17
 In January 1988, Loden and Fitzsimmons met in Buffalo with Spence and several others. That meeting was followed by a lunch meeting attended only by Loden, Fitzsimmons, and Spence. Loden expressed his displeasure with the performance of Spence's staff, stating that it seemed they were attempting to blame outside factors for the branch's failure to achieve the premium goal set by the Company. Spence then sought to discuss a problem he was having with one of his managers, Richard Dirmyer:
 
 
 18
 ... Loden indicated that he didn't wish to discuss Mr. Dirmyer's--any problem I might have with Mr. Dirmyer at this meeting and that he wanted--what he wanted to discuss was my lack of management of my managers or poor management of my managers.
 
 
 19
 I indicated to Mr. Loden that Mr. Dirmyer represented a serious challenge and as far as accepting management was a difficult person to manage because--his underwriting technical abilities were far superior to anyone in the office and it was--he--he took direction very--it was very difficult for him to accept direction. And I said he's very difficult to manage, and Mr. Loden stuck his face in my face and said, you are very difficult to manage, that's what we want to discuss is you, and you are very difficult to manage.
 
 
 20
 And at that point in time, he indicated that--once again, that his level of confidence in me--and Mr. Fitzsimmons joined with him, in that--that their level of confidence in my leadership and level of confidence in the people in Buffalo was no better after the meeting that [sic ] it had been before.
 
 
 21
 ... [I]t was made obvious to me before he departed again, I believe Mr. Fitzsimmons was there at the time, that my job was in jeopardy and that I was not managing in according--according to his wishes and what he wanted, and I took it--I took that to mean that he wanted me to manage the way he managed and I didn't feel that I could do that.
 
 
 22
 (Spence Dep. July 7, 1989, at 82-83.)
 
 
 23
 On February 3, 1988, Loden met with Spence in Maryland on the eve of a meeting with all branch managers, and essentially placed Spence on probation. Spence testified that Loden
 
 
 24
 said that he wanted to discuss my situation with me and he handed me a letter dated February 3rd, 1988 that was several pages in length and to which was attached copies of his letters to me following the agency review in the spring, the June meeting, the November meeting and maybe one other.... * He asked me to read these things because, basically, it would outline what he wanted to tell me.
 
 
 25
 (Id. at 95-96.) The three-page February 3, 1988 letter gave examples of questions that Loden had asked of Spence's managers, to which he had received widely disparate answers or pleas of ignorance. It also cited certain measures and controls that Spence was supposed to have instituted but apparently had not. The letter stated that another review would be conducted in mid-April and that "[i]f, in my opinion, the situations that I have been talking to you about since April of last year have not been corrected," Spence would be "placed on formal counseling" for 60 days; if the problem were not corrected by the end of that period, Spence would be relieved of his responsibility as branch manager. (Letter from Rick Loden to E.J. Spence, dated February 3, 1988, at 3.) The letter demanded that, in the meantime, Spence report to Loden by February 26, 1988, on the institution of controls, and stated, "[i]n addition, I want you to reread the attached correspondence dated April 6, June 25 and November 5, and tell me why I have to keep repeating the same thing." (Id.) Adding that Loden considered the Buffalo branch to be "out of control," the letter stated:
 
 
 26
 I have made numerous trips to Buffalo and have told you on many occasions that I will provide you with whatever assistance you need in getting this situation squared away. However, I cannot manage your office for you. There is no reason whatsoever that after suggestions, recommendations and instructions, that these are not being followed. If you are not going to follow them, then we are both wasting our time.
 
 
 27
 (Id.) Spence testified:
 
 
 28
 I examined the letter and--and he said, well, basically, what it comes down to is I'm giving you six months to straighten out the Buffalo office or you will be terminated as the manager of the Buffalo office. I took that to mean that I was being placed on informal probation.
 
 
 29
 ....
 
 
 30
 At the conclusion of that, Mr. Loden again repeated that my management style was not acceptable and that he expected me to get on the ball, get on the stick, do it the way he wanted me to do it, and I took that to mean that I had to get more severe with the individuals.
 
 
 31
 (Spence Dep. July 7, 1989, at 96-97.) Spence then raised the question of his age:
 
 
 32
 This meeting lasted quite late, ... and Loden asked if I understood the seriousness of the situation. I told him I did, I asked Mr. Loden, assuming the worst case scenario, what he expected me to do, that I was almost 60 years of age and finding another job was not going to be easy for me, and Mr. Loden stated that it didn't bother him to place someone in that category out on the street, 59 and several months old, and that he, Mr. Loden, was not in any way bashful about terminating people.
 
 
 33
 He told me that he was indirectly responsible for the termination of several thousand people and ... that he personally terminated, I don't know, like, 2- or 300 people and that when it came to terminating me, he would do that, too. So that if there was any pleas [sic ] for leniency or whatever, he was telling me forget it.
 
 
 34
 (Id. at 97-98.)
 
 
 35
 ... Loden made it very clear to me that I was at the end of the rope as far as he was concerned, that I was going to do precisely and exactly what was contained in those letters, and if I didn't, I would be put on formal counseling, and if that didn't do the trick, then I would be terminated. I took it to mean that, yes, I was threatened.
 
 
 36
 (Id. at 109.)
 
 
 37
 A few days later, Loden and Fitzsimmons visited Spence's territory again, and Spence escorted them on various local visits. While waiting with Fitzsimmons for Loden in a hotel lobby, Spence, expressing concern, showed Fitzsimmons Loden's February 3 letter. Fitzsimmons apparently recognized the letter immediately and "basically agreed" with it.
 
 
 38
 And at that time Mr. Fitzsimmons said to me, well, I don't know what has happened to old Jack Spence that was so successful with the unions in Boston and then early two or three other administrations and indicating that I had changed for the worse, as it were. He then indicated that I had faced adversity before, that he had confidence that I would overcome whatever things were outlined in the letter, that I could do it if I wanted to apply myself.
 
 
 39
 (Id. at 113.)
 
 
 40
 Despite this encouragement, that trip was not without minor mishaps. Spence had carried Fitzsimmons's suitcase from his hotel room to the car but had left Fitzsimmons's briefcase behind. He also made at least one wrong turn while driving. Loden and Fitzsimmons commented on these errors more than once, suggesting that he might be "over the hill" (id. at 111), and Spence felt they were harassing him.
 
 
 41
 In April 1988, Spence met with Loden, Fitzsimmons, and a team from the Baltimore office for a review of the Buffalo office.
 
 
 42
 At the conclusion of that meeting with just myself, Mr. Loden, Mr. Fitzsimmons in the room, ... Mr. Loden was concerned that my letter to him at the end of February was not responsive. He handed his letter to me and he wanted me to tell him or demonstrate to him how he can be assured that I had gotten the message that was delivered to me in February with the letter of February the 3rd.
 
 
 43
 I then said to Mr. Loden, well, I--I think that I can give you specifics that are measurably quantitative that would answer that, that I did understand.
 
 
 44
 First and foremost, immediately upon returning to Buffalo, I felt very sick, I had not slept. I went to my doctor, Doctor Colin McCloud ..., who arranged to see me that very afternoon at 3 o'clock.
 
 
 45
 Dr. McCloud found that my blood pressure was elevated and he indicated to me that he was very concerned about it. He prescribed a beta blocker combined with a diuretic called Tenoretic and that I take that. He also prescribed some sleeping pills for me, ordered me to go home, and that was a Friday, and sleep 12 hours, 14, 15 hours, whatever it would take to get back in shape, and that I was to return to see him in one-week's time.
 
 
 46
 I told that to Mr. Loden that my blood pressure had actually gone up after receiving the letter and conference and that that was certainly a demonstration that I understood that I was being threatened. Rick said, good, that's what I intended, I wanted you to get the message, that's good.
 
 
 47
 (Id. at 122-23.)
 
 
 48
 In an annual personnel review in May 1988, Loden informed Spence that he would not receive a salary increase but that he was no longer on probation. Loden said Spence had come within an inch of being fired. Spence testified that Loden said
 
 
 49
 [t]hat I was lucky, really, because I had come that close to being fired. And then he said, well, actually we probably wouldn't fire you, we would reassign you to some other job because of your number of years with the company and so on, we wouldn't actually put you out on the street, we would reassign you to something else if it was available.
 
 
 50
 (Id. at 105-06.) Spence was not surprised not to receive a raise in light of the previous few months' events, but he considered Loden's statement to be harassment. He felt that it was bad enough to be denied a raise; but to be told that he was fortunate to still be around was demeaning, intimidating, and uncalled for. Still, Spence was relieved to have passed the test and been taken off probation. He and his employees "had a party in Buffalo that night." (Id. at 124.)
 
 
 51
 In early November 1988, Spence attended a meeting of branch managers. Loden and Fitzsimmons traveled from the airport with Spence to attend the meeting, and Spence thought he detected a coolness in their attitude. At the meeting Loden and Fitzsimmons ridiculed Spence's suggestions, and they rode back to the airport with someone else. Spence apparently viewed this as slightly harassing, testifying, "I presumed they didn't want to ride with me." (Id. at 139.)
 
 
 52
 At the end of November 1988, the Buffalo branch was selected for a personnel survey, a procedure in which a representative from the Baltimore office would visit and interview branch employees in private. No local substantive preparation was required, but headquarters generally gave two weeks' notice of an impending survey as a courtesy to facilitate hotel reservations, etc.; due to a snafu, headquarters did not do so on this occasion. Instead, Spence received a notifying telephone call from the Company's personnel director in Baltimore on November 29, virtually simultaneously with the arrival of the representative. Spence suggested that the representative should return to Baltimore and come back two weeks later. The personnel director rejected this suggestion on the ground that that would be wasteful. Spence then persuaded her to have the representative return to her hotel that day while he talked to the branch employees.
 
 
 53
 Spence complained to Fitzsimmons, who reported back that the survey was routine and he did not know why Spence had not received the usual notice. Fitzsimmons told Spence not to get his blood pressure up, that it was nothing for him to be concerned about.
 
 
 54
 On December 1, 1988, Spence was scheduled to attend a meeting of branch managers in Baltimore, and Loden had notified him that he would have to stay late for a meeting with Loden. Spence "expected that that [sic ] a minimum, LODEN intended again to berate me and threaten me with termination. I expected at the worst, I would be terminated at the meeting." (Spence Aff. p 56.) Spence testified that on November 30, 1988,
 
 
 55
 ... I visited with my doctor, [and] they found, in spite of the medication, my blood pressure was extremely high, my pulse was very high, I was very agitated and he ordered me home to bed. No meeting, go home and go to bed. And I did stop at [a nearby] agency because I had made the appointment, for a very brief span of time and went home and went to bed and I haven't been back to work since.
 
 
 56
 (Spence Dep. July 7, 1989, at 144.)
 
 
 57
 Spence testified that he refused to speak to Loden from the beginning of December 1988 onward, on the advice of his doctor and his attorney. Spence also testified as follows:
 
 
 58
 Q..... Did either Mr. Loden or Mr. Fitzsimmons or anybody else in a management position, between the beginning of 1987 and the time you left your employment say to you, Mr. Spence, we would like you to resign, or Mr. Spence, we would like to [sic ] you to retire or words to that effect?
 
 
 59
 A. No, not in those words.
 
 
 60
 Q. Nobody asked you to do that?
 
 
 61
 A. Nobody asked me to do that.
 
 
 62
 Q. To resign or to retire?
 
 
 63
 A. That's right. However, my doctor told me it was unsafe for me to continue working there, and using my doctor's advice, I remained away.
 
 
 64
 (Id. at 151-52.)
 
 
 65
 At some point, the Company's Human Resources Division ("HRD") investigated a complaint by another branch manager as to Loden's intimidatory methods. HRD reported to senior management that managers and others believed Fitzsimmons had, at least in part, abdicated his responsibility to Loden, and that Loden ran the Mid-Atlantic region in an "extremely intimidating manner." (Affidavit of Maryland Casualty Senior Vice President William C. Alexander, II, dated January 15, 1992, p 3.) As a result, in January 1989, the Company demoted Fitzsimmons and removed Loden from any supervisory responsibility over branch managers. (Id. p 4.)
 
 
 66
 Spence was promptly informed by the Company's vice president in charge of HRD that he would no longer have to report to Loden and Fitzsimmons. A letter from the Company summarized correspondence between Spence and Maryland Casualty in December 1988 and January 1989 as follows:
 
 
 67
 On December 20, 1988 your attorney, Philip H. Magner, Jr., wrote to the president of Maryland Casualty Company stating that you were well equipped to perform under normal business atmosphere but could not tolerate the "deliberate harassment and intimidation" you allege you received from Mr. Loden and Mr. Fitzsimmons....
 
 
 68
 On January 27, 1989, Maryland Casualty Company's attorney, Thomas S. Gill, wrote to Mr. Magner stating that neither Mr. Fitzsimmons nor Mr. Loden will have any direct management responsibility for the Buffalo Branch on and after February 1, 1989. Based on Mr. Magner's assertion that you could tolerate the normal stress of managing the Buffalo Branch, he relayed our request that you return to work on February 1, 1989, or notify us why you could not and give us an anticipated date of return.
 
 
 69
 (Letter from HRD Vice President Georgean Wardzinski to Erwin J. Spence, Jr., dated February 13, 1989.) While stating that the Buffalo branch needed leadership and that if Spence could not return to work within a reasonable time he would have to be replaced, this letter stated, "We are, of course, concerned about your health and your plans to return to work. Your service to the Company has been long, and we hope that you will return soon." (Id.)
 
 
 70
 Spence never returned to work. Eventually, in a letter dated April 11, 1989, the Company's benefits manager asked Spence to apply for long-term disability benefits, for which he would be eligible after 180 days of disability. Spence responded by letter dated May 9, 1989, requesting that Maryland Casualty pay him pension benefits beginning on June 1, 1989, and stating, "my physician has advised against my return to work at the company." Spence had not, however, informed his doctor that Loden and Fitzsimmons had been demoted and that he would no longer have to report to them. (Spence Dep. July 24, 1989, at 5.)
 
 
 71
 B. The Present Action and the Decision Below
 
 
 72
 In the meantime, Spence had commenced this action on February 2, 1989, alleging that defendants, motivated by his age, abused him and forced his resignation and/or early retirement. He sought compensatory and punitive damages of several million dollars under the ADEA and state law. Following discovery and motion practice, defendants moved for summary judgment on the ground that Spence had adduced no evidence that he was discharged or that he was treated adversely because of his age.
 
 
 73
 In an opinion reported at 803 F.Supp. 649 (1992), the district court granted summary judgment in favor of defendants. The court ruled that Spence's submissions in opposition to summary judgment were sufficient to make out a prima facie case of constructive discharge:
 
 
 74
 Plaintiff has described sufficient incidents to demonstrate adverse conditions in the workplace. Similarly, this Court finds that the record demonstrates a constructive discharge, since a reasonable person in plaintiff's shoes would have felt compelled to resign. In making this determination, this Court notes that a reasonable person in plaintiff's shoes also would reasonably conclude, as plaintiff did, that the workplace incidents were a proximate cause of his medical condition and anxiety. This is demonstrated by the proximity in time between interactions with Loden and Fitzsimmons, plaintiff's subsequent physical discomfort, and negative medical reports from plaintiff's physicians.
 
 
 75
 803 F.Supp. at 667. The court also found that Spence had produced sufficient evidence to permit an inference of age discrimination. However, the court ruled that defendants, in turn, had produced sufficient evidence to rebut Spence's prima facie case, by showing that their actions were not motivated by age discrimination but rather by "job performance deficiencies regarding plaintiff's performance in particular and the Buffalo office in general." Id. at 669. It found that Spence's "contention that it was implausible that his employer's behavior toward him was motivated by poor performance is not supported by the record." Id.
 
 The court also rejected Spence's argument
 
 76
 that defendants' intent to accelerate plaintiff's deteriorating medical condition is reason in itself to show that defendants did not possess "any legitimate or non-discriminatory motive" in their actions toward plaintiff. However, this argument is insufficient to rebut defendants' contentions that Loden was equally abusive to all his underlings, even the one who was not in the protected age group. Loden's intimidating behavior to all his subordinates may be evidence of an impersonable, overly aggressive, and even unsavory manager, but without more it does not demonstrate that his actions were motivated by age.
 
 
 77
 Id. at 670. The court found that Spence's evidence as to defendants' comments about his age represented only "stray remarks uttered in the workplace. As such they are insufficient to create a material issue of fact to defeat a summary judgment motion." Id. The court concluded that
 
 
 78
 plaintiff has failed to meet his burden of establishing by a preponderance of the evidence that defendants' reasons for their actions toward plaintiff were a mere pretext for age discrimination. Therefore, this Court grants defendants' motion for summary judgment on plaintiff's age discrimination claims under the ADEA and New York's Executive Law.
 
 
 79
 Id. at 670-71.
 
 
 80
 The court also rejected the possibility that Spence could establish a claim of "hostile work environment." Though it found that Spence had sufficiently demonstrated adverse conditions in his work environment, it reasoned that such a claim must fail unless the plaintiff can " 'prove that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.' " Id. at 671 (quoting Kotcher v. Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 63 (2d Cir.1992)). Since Maryland Casualty had investigated Loden and Fitzsimmons at the behest of another branch manager and, as a result of that investigation, demoted them, Spence could not establish the requisite elements. The court also rejected Spence's state-law claims for wrongful discharge and intentional tort.
 
 
 81
 Judgment was entered dismissing the complaint, and this appeal followed.
 
 II. DISCUSSION
 
 82
 On appeal, Spence contends principally that the district court erred in concluding that there was insufficient evidence of age discrimination. He also contends that the court improperly denied him discovery regarding Maryland Casualty's hiring practices in other regions.
 
 
 83
 The latter contention has not been preserved for appeal. The discovery matters had been referred to a magistrate judge, who limited discovery and denied Spence's motion for reconsideration of the limitations. A party is allowed to file objections to such an order within 10 days, and "may not thereafter assign as error a defect in the magistrate's order to which objection was not timely made." Fed.R.Civ.P. 72(a). Spence did not object in the district court to the magistrate judge's rulings within the period allowed by the Rules or, indeed, at any time prior to the entry of final judgment. Accordingly, he may not challenge those discovery rulings in this Court.
 
 
 84
 We reject Spence's challenges to the dismissal of his complaint for the reasons stated below.
 
 A. The ADEA Claims
 
 85
 In order to establish a prima facie case of termination of employment in violation of the ADEA, a plaintiff must show (1) that he was within the protected age group, (2) that he was qualified for the job, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination. See, e.g., Stetson v. NYNEX Service Co., 995 F.2d 355 (2d Cir.1993); Hollander v. American Cyanamid Co., 895 F.2d 80, 83 (2d Cir.1990); Pena v. Brattleboro Retreat, 702 F.2d 322, 324 (2d Cir.1983). If a prima facie case is established, the employer must offer a legitimate, nondiscriminatory reason for its actions. See Hollander v. American Cyanamid Co., 895 F.2d at 83. If the employer comes forward with such a reason, the burden is on the plaintiff to show that the proffered nondiscriminatory reason was merely a pretext for discrimination. See id.
 
 
 86
 In addressing any of these elements on a motion for summary judgment, the court is not to weigh the evidence or resolve issues of fact but only to determine whether there are issues to be tried. See, e.g., Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir.1989); Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir.1987). It is not entirely clear that the district court in the present case adhered to this principle, since its ultimate conclusion was that Spence had "failed to meet his burden of establishing by a preponderance of the evidence" that defendants' proffered reasons for their actions toward plaintiff were a mere pretext for age discrimination. We need not determine whether that conclusion bespeaks a weighing of the evidence, however, for questions as to nondiscriminatory reasons and pretext do not come into play unless the plaintiff has proffered sufficient evidence to permit a finding in his favor with respect to each element of the prima facie case, and we conclude that the record here was insufficient to create a triable issue as to the element of discharge.
 
 
 87
 A "constructive discharge," satisfying the third element of the prima facie case, occurs when an employer " 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " Pena v. Brattleboro Retreat, 702 F.2d at 325 (quoting Young v. Southwestern Savings & Loan Ass'n, 509 F.2d 140, 144 (5th Cir.1975)). As discussed in greater detail in Stetson v. NYNEX Service Co., 995 F.2d 355 (2d Cir.1993), a constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant. See, e.g., id.; Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1162 (3d Cir.1993); cf. Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir.1985) (rejecting claim of constructive discharge under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17 (1982)).
 
 
 88
 A constructive discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health. See, e.g., Meyer v. Brown & Root Construction Co., 661 F.2d 369, 371-72 (5th Cir.1981) (constructive discharge in violation of Title VII where pregnant employee transferred to position requiring heavy manual labor). But an employer is entitled to insist on as high a standard of work performance as it deems appropriate, and the fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer. Unless the evidence is sufficient to permit a rational trier of fact to find that the employer deliberately created working conditions that were " 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign,' " Pena v. Brattleboro Retreat, 702 F.2d at 325 (quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir.1977)), a claim of constructive discharge should be dismissed as a matter of law, whether by judgment setting aside a verdict in the plaintiff's favor, see Pena v. Brattleboro Retreat, 702 F.2d at 326, or by summary judgment, see Stetson v. NYNEX Service Co., 995 F.2d 355 (2d Cir.1993).
 
 
 89
 The record in the present case does not contain evidence from which a rational trier of fact could conclude that in late 1988 or 1989, a reasonable person in Spence's position would have felt compelled to resign. Spence seeks principally to characterize defendants as deliberately attempting to make him ill in order to force him to resign, repeatedly arguing that Loden, upon learning that his treatment of Spence had caused Spence to be ill, responded "good, that's what I intended." (Spence brief on appeal at 15, 29-30, 31.) For example, Spence states:
 
 
 90
 At the April conference, Plaintiff informed Defendants LODEN and FITZSIMMONS that their stresses upon Plaintiff had made Plaintiff physically ill, requiring medication and doctor's supervision. Defendant LODEN, in Defendant FITZSIMMONS' presence, stated: "Good, that's what I intended."
 
 
 91
 (Id. at 15.) As revealed at pages 122-23 of the Spence deposition quoted in Part I.A. above, however, the discussion in question neither began with Spence's statement about his health nor ended with the quoted part of Loden's sentence. Rather, the discussion began with Loden's demanding assurance that Spence had "gotten the message ... delivered to [Spence] in February with the letter of February the 3rd." (Spence Dep. July 7, 1989, at 122 (emphasis added).) In response, Spence sought to assure Loden that he did understand, by describing at length his physical manifestations of anxiety, his visits to his doctor, and his medication, ending with the statement that this was "certainly a demonstration that I understood that I was being threatened." (Id. at 123 (emphasis added).) Loden's response was, "good, that's what I intended, I wanted you to get the message, that's good." (Id. (emphasis added).) Though this response by Loden--consistent with his apparently rough treatment of all who worked under him--lacked any semblance of kindness or compassion, it was not as cruel as Spence repeatedly and uniformly presents it out of context; and in the context in which Spence's own deposition placed it, the quoted snippet is not sufficient to support a claim that defendants deliberately set out to make him ill so that he would have no reasonable alternative but to resign.
 
 
 92
 Nor does the record of undisputed facts detailed in Part I.A. above, taken from Spence's deposition and his affidavit, permit the inference that Spence's working conditions in general under Loden and Fitzsimmons were so intolerable that a reasonable person in Spence's position would have felt compelled in late 1988 or early 1989 to resign. First, we question whether even the evidence of Loden's constant criticisms from the spring of 1987 to April 1988 revealed conditions so intolerable as to cause a reasonable person in Spence's shoes to feel compelled to resign. Plainly Spence did not feel so compelled. Loden's criticisms were quite concrete, and Spence tried to meet them. More importantly, Spence's description of the last six months prior to his cessation of work revealed no conduct by defendants that a rational trier of fact could possibly view as creating conditions that were intolerable. The latest arguably harassing conduct pointed to by Spence was Loden's April 1988 lack of kindness upon hearing Spence's description of his physical condition. Yet Spence does not contend that he was constructively discharged in April 1988. And though he said he viewed Loden's May 1988 statement that he had come within an inch of being fired, coupled with the lack of a salary increase, as harassment, Spence testified that in fact he was relieved that he had passed the test and would not be fired or reassigned. He and his employees promptly went out and celebrated.
 
 
 93
 Spence did not testify to any intimidating conduct by defendants between May and November 1988. And the only November events, taking Spence's descriptions as true, consisted of (a) ridicule by Fitzsimmons and Loden of suggestions Spence made in a meeting, (b) their decision to ride back to the airport with someone other than Spence, and (c) the Company's commencement of a personnel survey of the Buffalo branch without the ordinary pro forma two-weeks' notice to Spence. These November events, following an uneventful six months that had begun with relief and celebration, could not suffice to permit a rational trier of fact to find it reasonable for Spence to conclude at or after the end of November 1988 that he was forced to resign.
 
 
 94
 Moreover, the record reveals that Spence had a quite effective alternative to resignation. He could have lodged a complaint about Loden to the Company's HRD. A Spence counterpart in another branch so complained, and the complaint resulted in the removal of Loden and Fitzsimmons from their positions as supervisors of the branch managers. Indeed, following his embarcation on disability leave, Spence had his attorney write to Maryland Casualty's president, stating that Spence could work under normal conditions but not under Loden and Fitzsimmons. The Company responded that Loden and Fitzsimmons had been demoted and that Spence would not have to report to them again. Spence's response to this information, however, was (a) to file this lawsuit, and (b) to inform the Company that he declined to return to work on the advice of his doctor, whom he later admitted he had not informed of the elimination of the Loden-Fitzsimmons problem.
 
 
 95
 In sum, Spence has pointed to no even arguably intolerable working conditions for at least six months prior to his taking disability leave, and there is no dispute that the Company was trying to accommodate his health concerns thereafter. In light of the evidence proffered by Spence in opposition to summary judgment, viewed in the light most favorable to him, no rational trier of fact could find that in late 1988 or early 1989, a reasonable person in his position would reasonably have concluded that he had no alternative but to resign. Accordingly, summary judgment dismissing his ADEA claims was proper for lack of proof of constructive discharge.
 
 B. The State-Law Claims
 
 96
 We also find no error in the district court's dismissal of Spence's state-law claims. Spence's age discrimination claim under state law, see N.Y. Exec. Law §§ 290-301 (McKinney 1993), is governed by the same standards as his ADEA claim, see, e.g., Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992), and was therefore properly dismissed. As an at-will employee, Spence had no cause of action for wrongful discharge under New York law. See Murphy v. American Home Products Corp., 58 N.Y.2d 293, 300-02, 461 N.Y.S.2d 232, 235-36, 448 N.E.2d 86, 88-89 (1983). Defendants' criticisms of Spence's job performance and their conditional threats of termination prior to May 1988 fall far short of the "extreme" and "outrageous" conduct that is actionable as an intentional infliction of emotional distress. See, e.g., Martin v. Citibank, N.A., 762 F.2d at 220; Murphy v. American Home Products Corp., 58 N.Y.2d at 303, 461 N.Y.S.2d at 236, 448 N.E.2d at 90 (plaintiff cannot evade the at-will contract rule by "casting his cause of action in terms of a tort of intentional infliction of emotional distress").
 
 CONCLUSION
 
 97
 We have considered all of Spence's contentions that are properly before us on this appeal and have found them to be without merit. The judgment of the district court is affirmed.
 
 
 
 *
 Honorable Robert L. Carter, of the United States District Court for the Southern District of New York, sitting by designation