Steven E. KADER, Plaintiff–Appellant–
Cross–Appellee,

v.

PAPER SOFTWARE, INC. and Michael
Mccue, Defendants–Appellees–
Cross–Appellants.

Nos. 790, 1412, Dockets 96–
7812(L), 96–7868(XAP).

United States Court of Appeals,
Second Circuit.

April 18, 1997.

Richard S. Taffet, Golenbock, Eiseman, Assor & Bell, New York City, for Plaintiff–Appellant–Cross–Appellee.

Elliot Silverman, New York City (Steven J. Cohen, Gold & Wachtel, L.L.P., on the brief), for Defendant–Appellee–Cross–Appellant.

---

\* The Honorable Donald P. Lay, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. Kader's complaint also asserted claims for intentional infliction of emotional distress (and/or prima facie tort), and for violation of various New York state business statutes. The district

Before JACOBS, CALABRESI, and LAY,\* Circuit Judges.

JACOBS, Circuit Judge:

This appeal arises out of an employment contract between plaintiff Steven E. Kader and Paper Software, Inc. ("Paper"). Kader argues that his employment became intolerable when he learned that his boss, defendant Michael McCue (the founder, president, and sole shareholder of Paper) was involved in a sexual relationship with Kader's wife, who was also an employee of the company. Kader appeals from a June 5, 1996 final judgment of the United States District Court for the Northern District of New York (Cholakis, J.) granting summary judgment in favor of Paper and McCue on Kader's claims for constructive discharge and breach of the duties of good faith and fair dealing.[1] Paper and McCue cross-appeal from the district court's dismissal (on summary judgment) of their cross-claims that Kader breached his employment contract and his fiduciary duties of loyalty and confidentiality. See Kader v. Paper Software, Inc., No. 94–CV–1602 (CGC) (Memorandum Decision and Order) (N.D.N.Y. June 4, 1996) ("Order").

We affirm.

## BACKGROUND

We review de novo the district court's grants of summary judgment dismissing Kader's complaint and the defendants' counterclaims, "view[ing] the evidence in a light most favorable to … the non-moving part[ies], and draw[ing] all reasonable inferences in [their] favor." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.1993).

In September 1993, McCue hired Kader to work as a computer programmer at Paper, a software development company. Kader and Paper executed a two-year employment contract setting Kader's compensation at $100,-

court granted the defendants summary judgment on those claims, see Kader v. Paper Software, Inc., No. 94–CV–1602 (CGC) (Memorandum Decision and Order), at \*5 (N.D.N.Y. June 4, 1996), and Kader did not appeal that portion of the judgment.

000 the first year and $150,000 the second. Kader's wife, Caroline Trzcinski, had already been working at Paper for several months as an administrator and marketing representative. Kader and Trzcinski, who were experiencing marital problems, separated in May 1994. That month, Trzcinski and McCue began a sexual relationship that they announced to Kader in June or July.

Throughout that summer, the three continued to work in the same small suite of offices, and Kader continued to work directly with McCue on the company's important IBM project, for which Kader had primary responsibility. Kader alleges, *inter alia*, that McCue and Trzcinski openly displayed their affection for each other in and around the office, that McCue told others at Paper about the affair, and that Trzcinski attempted to limit Kader's social contact (at lunches) with other Paper employees.

On August 9, 1994, Kader announced that he was following his doctor's recommendation to take a two-week medical leave of absence because "the strain from learning of the liaison" had "t[aken] a physical toll on [him]." In response, McCue demanded that Kader return all company property in Kader's possession, and told him not to return to work or contact any of Paper's clients until the two had met to discuss Kader's job status. At a September 12, 1994 meeting, McCue imposed certain conditions on Kader's return, insisting that Kader accept working hours and reporting requirements such as: working only 9:00 a.m. to 5:00 p.m., Monday through Friday; signing in and out of the office whenever he entered or left; and providing McCue with daily progress reports and attending weekly status meetings. McCue thereafter sent several letters asking Kader to return, including an October 17, 1994 letter saying, "I have not placed any restrictions on your return," and restating in milder terms the time and reporting conditions. Kader never accepted McCue's invitation, and never returned from his medical leave, although he did demand and receive payment of his current and past-due salary. Kader filed the present suit against Paper and McCue in December 1994.

## DISCUSSION

### A. Constructive Discharge.

Kader maintains that Paper constructively discharged him and thereby breached its employment agreement with him under New York law. Constructive discharge occurs when an employer "*deliberately* makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Spence v. Maryland Casualty Co.*, 995 F.2d 1147, 1156 (2d Cir.1993) (emphasis added) (internal quotations omitted); *see also Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir.1993); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983). Kader's claim does not meet this standard.

Kader's predominant complaint, as the pleadings and record make abundantly clear, is that he suffered the humiliation and stress of working under the direct supervision of a person who was conducting a sexual relationship with Kader's wife, and in proximity to the new couple. If the open liaison between McCue and Trzcinski is viewed as one of Kader's working conditions, it may be deemed "intolerable"; it may also be deemed "intentional," as opposed to inadvertent or fortuitous. But these circumstances do not support a claim for constructive discharge: there is no evidence to support the inference that McCue's conduct was a deliberate creation of *working conditions*, intolerable or otherwise, because the deterioration (if any) of Kader's working conditions was only the incidental effect of McCue's independent carnal objectives. As Kader conceded at oral argument, the affair was *not* commenced in order to force his resignation. Indeed, it is patent that McCue and Trzcinski did not enter into their relationship for the purpose of altering Kader's working conditions. Kader therefore cannot establish a fundamental element of his claim, that his "employer deliberately created working conditions" that led to Kader's resignation. *Spence*, 995 F.2d at 1156.

Under these circumstances, the district court held: "[a]lthough it is certainly understandable that working in an office where the

owner of the company has had an affair with your now ex-wife may be uncomfortable, this is not the deliberate creation of intolerable working conditions." Order at 4. We agree. Neither our cases nor New York law have examined what relationship between deliberateness and the intolerability of working conditions is required to constitute constructive discharge. But we conclude that whatever is required was not supplied here.

Kader argues that his claim rests not on the office affair alone, but on all of the deteriorating conditions of his employment, specifically: (a) office-wide knowledge of McCue's relationship with Trzcinski; (b) restriction on Kader's social contact with other employees; (c) Kader's banishment from work; (d) the time and reporting requirements established by McCue; and (e) the removal of Kader's company property. Kader alleges that these other conditions were deliberately imposed, and that the district court erred by failing to consider them in the context of McCue's relationship with Trzcinski. He argues that courts must examine the cumulative effect of all the factors comprising a complainant's working conditions, and that, under this analysis, the conditions that he alleges were imposed deliberately should be deemed intolerable and thus supportive of his claim for constructive discharge.

■ We agree that the constructive discharge standard requires consideration of working conditions as a whole rather than one by one. *See, e.g., Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 90 (2d Cir.1996) ("Because a reasonable person encounters life's circumstances cumulatively and not individually, ... [a court should not] treat the various conditions [of a plaintiff's work environment] as separate and distinct rather than additive."). But we disagree with Kader's contention that the district court misapplied that standard here. Even when "[v]iewed as a whole," the facts in this case do *not* "permit a finder of fact to conclude that [Kader] was forced to resign." *Id.*

Preliminarily, it is incontestable that all of the conditions that Kader deems intolerable arose out of the McCue–Trzcinski affair, conduct that concededly was *not* intended by Kader's employer to create an intolerable work environment. *Cf. Spence,* 995 F.2d at 1156. Moreover, the undisputed facts render Kader's additional, specific charges untenable:

(a) It is apparently true that some people in Paper's offices knew or guessed about the affair; Kader cites the testimony of a co-worker who spied McCue and Trzcinski embracing in a back room. But there is no evidence that McCue *told* anyone about the affair *prior* to the time that Kader filed his complaint in this case, let alone that McCue did so in order to pain Kader.

(b) Kader alleges that Trzcinski tried to limit his social contact with other employees, especially at lunch. But Trzcinski was not Kader's boss, and Kader does not connect Trzcinski's efforts to any intentional conduct by their employer.

(c) As to Kader's banishment from work, Kader initiated it, when he took medical "stress" leave. Under the circumstances, no intent to fire Kader can be deduced from McCue's direction that Kader stay away from Paper and refrain from contacting clients until the two of them could sit down to talk through the situation; open issues undeniably remained.

(d) Kader complains about the time and reporting requirements imposed by McCue at their September 12 meeting. None of these conditions—working only 9:00 a.m. to 5:00 p.m., signing in and out of the office, and providing daily progress reports and attending weekly status meetings—seems onerous or humiliating. The undisputed point, however, is that the conditions were never actually enforced by McCue, and Kader was not subject to them for a single working day. As the district court noted, "Kader never returned to work after these conditions were imposed, thus his claims as to the impact upon him are based on his somewhat visceral reaction to the suggestion." Order at 4 n. 1. Moreover, McCue's October 17 letter invited Kader to return to work without "any

restrictions on [his] return," and thus rescinded the requirements that Kader contends were onerous.[2] Kader therefore never actually experienced the "intolerable" conditions that he alleges were imposed deliberately—a root distinction between his case and those cases (cited by Kader) in which plaintiffs were forced to endure prolonged and continuous harassment or severe abuse.[3]

(e) Finally, Kader complains that McCue came to his house to remove company property; but considering Kader's lengthening absence from work and his key position on a major ongoing project (not to mention the bad feeling between Kader and his boss), this step was merely prudent. It cannot be inferred that McCue was recovering company papers in order to harass Kader.

In short, McCue's affair with Trzcinski did not constitute the deliberate creation of working conditions. Of the other conditions cited by Kader, one was self-imposed; some were created by persons other than the employer; most were not onerous to begin with, and were in any event rescinded before they were enforced; and the last was a prudent precaution for this employer in these circumstances. Kader has demonstrated that an uneasy and stressful environment existed, but he has adduced no evidence to support an inference that his employer intentionally created an intolerable workplace.[4]

■ Kader's showing is therefore insufficient as a matter of law:

a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."

*Stetson*, 995 F.2d at 361 (citations and internal quotations omitted) (holding no claim for constructive discharge where employee was dissatisfied with his compensation, assignments, and criticisms of his work, but rank and salary were never reduced). *See also Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir.1985) (no claim where employee had unpleasant assignments and difficult relationship with supervisor but suffered no more than petty irritants); *Pena*, 702 F.2d at 324–26 (no claim where employee was dissatisfied with nature of work assignments and change in responsibilities but had experienced no loss of pay or change in title); *Spence*, 995 F.2d at 1156 ("[A]n employer is entitled to insist on as high a standard of work performance as it deems appropriate, and the fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer.").

### B. *Good Faith and Fair Dealing.*

■ The district court also properly dismissed Kader's claim that the defendants breached their duties of good faith and fair

---

2. McCue's October 17 letter to Kader states in part:

    As stated in our meeting on September 12, I need you to work at least 40 hours per week and submit written weekly status reports and schedules regarding the projects you are involved with. Remember that in order to comply with your employment contract, all vacations must be requested with 15 days notice and must be coordinated with me.

3. *See, e.g., Dortz v. City of New York*, 904 F.Supp. 127, 159–60 (S.D.N.Y.1995) (plaintiff suffered sexual harassment and retaliation by supervisor, but was still required to engage in daily dealings with him); *Payton v. Metro–North Commuter R.R.*

*Co.*, 1995 WL 640591, at *4 (S.D.N.Y. 1995) (plaintiff suffered pattern of unwarranted discipline and harassment over period of 19 months).

4. Neither the employment contract nor New York employment law in general renders this employer's consensual sexual behavior a workplace condition for Kader. Quite distinct are cases that arise under a law that does impose on employers specific obligations with respect to workplace conditions; this opinion therefore does not bear upon the constructive discharge of a person who is subjected to workplace conditions (such as sexual harassment or racial hatred) that may not be created by an employer as a working condition but that the employer may be required by law to ameliorate.

dealing by preventing him "not only from carrying out the terms of his employment agreement in all respects but also from receiving the compensation and other benefits provided for under the agreement." Appellant's Brief at 38. This claim has the same defects as the constructive discharge claim. The covenant of good faith and fair dealing, implied in every contract under New York law, "includes 'an implied undertaking on the part of each party that he will not *intentionally and purposely* do anything to prevent the other party from carrying out the agreement on his part.'" *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991) (quoting *Grad v. Roberts*, 14 N.Y.2d 70, 75, 248 N.Y.S.2d 633, 637, 198 N.E.2d 26, 28 (1964)) (emphasis added). As explained above, Kader cannot show that any of the defendants' (allegedly) *intentional* acts were sufficient to prevent him from "carrying out the terms of his employment agreement in all respects"; and the only act of the defendants that might arguably have been an impediment—the McCue–Trzcinski affair—concededly was *not* committed "intentionally and purposely" to achieve that result.

### C. *Counterclaims.*

The district court dismissed both of the defendants' counterclaims, essentially for lack of admissible evidence that the defendants suffered damages by reason of Kader's departure. The counterclaims allege: (1) that Kader breached his employment contract by refusing to return to work, thus causing Paper to lose a lucrative contract with IBM (apparently Paper's second biggest project); and (2) that Kader breached his fiduciary duty to Paper by performing computer services for his father's company (on Paper's time) and by disclosing confidential information.

■ The fiduciary duty claim borders on the frivolous. The record does not contain sufficient facts to demonstrate that Kader "use[d] or divulge[d] confidential knowledge acquired during his employment." *Kaufman v. IBM Corp.*, 97 A.D.2d 925, 470 N.Y.S.2d 720, 723 (3d Dep't 1983), *aff'd mem.*, 61 N.Y.2d 930, 474 N.Y.S.2d 721, 463 N.E.2d 37

(1984); *see also Q–Co Indus., Inc. v. Hoffman*, 625 F.Supp. 608, 617 (S.D.N.Y.1985).

■ As to the breach of contract claim, Kader argued in the district court that the defendants failed to provide any admissible evidence to support the claim, and in particular that they had "not provided support for any of the damages asserted in these claims." Order at 3. The district court granted Kader summary judgment, rejecting the defendants' arguments that their claim was sufficiently particularized and contained sufficient allegations of damages. *Id.* Upon our *de novo* review, we agree with the district court.

The counterclaimants' theory is that the company suffered injury when Kader left Paper in the lurch on the IBM contract. The particulars offered in support are that Kader was the principal (perhaps only) employee at Paper assigned to the IBM project; that he had extensive contact with his counterparts at IBM, including frequent travel to IBM's offices; that after Kader's departure, his IBM contacts expressed concern to McCue over Kader's absence from the project; and that ultimately these individuals became dissatisfied with Paper's performance, causing IBM to cancel the contract and Paper to suffer monetary damages. In opposition to Kader's motion for summary judgment, McCue filed a declaration that undertook to substantiate Paper's damages through "realistic" estimates "based on [his] direct experience."

The difficulty for the defendants is that much of what McCue says about the reasons for the loss of the IBM contract, and the damages therefrom, is inadmissible hearsay. Indeed, McCue admits that he

> attempted to obtain testimony from IBM representatives with knowledge of Kader's faulty performance and the deterioration of the relationship between [Paper] and IBM which resulted. Regrettably, the corporate culture at IBM is such that individuals are fearful of "getting involved" in the affairs of others, and, as a result, I have been unable to obtain a corroborative statement from IBM.

In these circumstances, we agree with the district court that the defendants failed to

come forward with admissible evidence demonstrating a genuine issue for trial on the breach of contract claim, and thereby failed to carry their burden in opposing summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). McCue's declaration furnishes insufficient support for the fact that Kader's absence from the project caused the loss of IBM's business, the amount of business IBM would otherwise have done with Paper, and the profit (if any) Paper would have realized from that business. Even if Kader's absence did disrupt his employer's relationship with IBM, it is impossible to see how the defendants can attribute the loss to Kader's conduct when they conceded at oral argument that the McCue–Trzcinski affair was "emotionally unfortunate" and "emotionally awkward"; that in light of the affair it "would have been very emotionally uncomfortable for [Kader] to come to work"; and that it was "understand[able] at a human level why [Kader] didn't want to come to work," and "very understandable" that he would have been "very uncomfortable" doing so. Although (as held above) the employer did not precipitate these events for the purpose or with the intent of altering Kader's working conditions, that was admittedly the effect of what was done; and having done that, the employer cannot hold Kader accountable for the consequences of his departure.

Last, the defendants argue on appeal that they are entitled at least to recover the salary that was paid to Kader during his (ultimately permanent) medical leave from Paper. At oral argument, counsel for the defendants conceded that the evidence of damages from the loss of the IBM contract was "thin[ ]," but maintained that the defendants were "serious" about the claim for "the salary for the time that [Kader] didn't show up" to work. The counterclaims, however, do not contain a plea for the return of wages, and the McCue declaration neither specifies nor substantiates the amount of any such claim.

Consistent with the defendants' concession at oral argument that "we would not have sued [Kader] had he not sued us," we think it obvious that the counterclaims here were merely tactical.

## CONCLUSION

For the reasons stated, the judgment of the district court dismissing Kader's claims and the defendants' counterclaims is affirmed in full.