Cirilo RODRIGUEZ, Plaintiff,

v.

James MARGOTTA and The Village
of Sleepy Hollow, Defendants.

No. 98 Civ. 1176(CM).

United States District Court,
S.D. New York.

Oct. 27, 1999.

Kevin A. Stevens, Croyle, Williams & Stevens, Suffern, NY, for Cirilo Rodriguez, plaintiff.

Michael A. Miranda, Miranda & Sokoloff, New York City, for James Margotta, defendant.

MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff Cirilo Rodriguez is a building contractor in the Village of Sleepy Hollow. Defendant James Margotta is the Building Inspector of the Village. Plaintiff filed a claim against defendants Margotta and the Village of Sleepy Hollow for violating plaintiff's Fourth, Fifth, and Fourteenth Amendment rights in violation of 42 U.S.C. Sections 1981, 1982 and 1983. Plaintiff alleges that Mr. Margotta's repeated inspections of his construction sites, his demands that plaintiff comply with the local and state building codes, and his support of a criminal action brought against plaintiff for violations of the electrical code, constitute selective enforcement and harassment motivated by personal and ra-

cial animus in violation of equal protection and substantive and procedural due process. He further alleges that Margotta's action were in retaliation against plaintiff for exercising his First Amendment right to political speech, and that statements by Margotta to third parties about the quality of Rodriguez's work as a contractor constituted defamation.

Defendants filed a motion for summary judgment on the grounds that Plaintiff had failed to state a claim against either Mr. Margotta and the Village of Sleepy Hollow, and on the alternate ground that Mr. Margotta is qualifiedly immune from suit as an official of the village. For the grounds set out below, I grant summary judgment in favor of defendant Margotta and dismiss the case against the Village of Sleepy Hollow.

*Background*

The following is a statement of facts viewed most favorably to Plaintiff:

The Village of Sleepy Hollow, New York, a town known until 1996 as North Tarrytown, has a population of around 9,000 citizens of diverse racial, ethnic, and socio-economic backgrounds. Hispanics represent the largest single ethnic group in the Village; 49 percent of the school-aged population is Hispanic. *See New York Times*, "A Sense of the Past in a Diverse Village," 18 July 1999. Plaintiff Cirilo Rodriguez is a Hispanic building contractor in the Village of Sleepy Hollow.

Defendant James Margotta is the Sleepy Hollow Building Inspector, a part-time position he has held for approximately fifteen years. In that capacity, Mr. Margotta is responsible for enforcing the Village Zoning Code and Building Code, both of which incorporate the New York State Uniform Fire Prevention Code. In the course of his duties, Mr. Margotta has had occasion to inspect buildings where the plaintiff is owner, tenant, and/or, in several instances, the general contractor. It is the inspection of several of these work sites and the enforcement of the village and state building and fire codes that are at issue in this case.

*166 Cortlandt: Chester Chicken*

In late 1995, Plaintiff and Miguel Jiminez (a former member of the Village Zoning Board of Appeals and father-in-law of Plaintiff) sought a permit to install a fried chicken take-out restaurant at 166 Cortlandt Street known as "Chester Chicken." The building was owned, at the time, by a Mr. Ianerelli. Mr. Margotta denied the application on October 25, 1995, pursuant to § 62.20.1 of the Village Zoning Code, which requires that there be at least 200 feet between food service establishments. (The proposed restaurant was within 200 feet of "Mike's Deli.") After the matter was referred to the Zoning Board of Appeals, a variance was issued. The ZBA approved the installation of the fried-chicken establishment on January 17, 1996, at the same time declaring that there was no adverse impact on the environment, thus avoiding the need for a State Environmental Quality Review Act. (Margotta Aff.Ex. D).

The record indicates that Plaintiff and Mr. Jiminez did not make an application for a building permit until May 24, 1996. This request was based on drawings signed by architect Sean McCarthy on March 15 and April 15, 1996. Plumbing permits are required for all plumbing and gas work done in the village; no plumbing permit was requested. Because the site was a food service establishment, a review of the plans by the Westchester County Department of Health was also required. On March 19, 1996, The Department of Health found the McCarthy plans unacceptable because, among other things, the plans did not include the location of required pieces of equipment such as exhaust discharge. The Department requested an addendum to the original drawings of the restaurant.

At around this time, Mr. Margotta visited the site and performed an inspection of the premises. By late March, much of the plumbing work had been installed, as was

gas piping and a gas-fired heating unit. On March 25 and March 29, Mr. Margotta wrote to the Village Attorney, Janet Gandolfo, informing her that he had discovered code violations during his inspection of the premises, and noting that the plumbing and gas work was completed in violation of Village Code § 45–5 (performing plumbing work without a license) and § 45–28 (installing plumbing without a plumbing permit). In his correspondence he noted his concern that the plumbing and gas installation created a fire hazzard and potential danger to tenants in the apartment building above the proposed restaurant, and recommended that legal action be taken against the occupants of the store if the violations were not remedied. Mr. Margotta also informed Mr. Ianerelli that as owner of the property he was responsible to see that the plumbing and gas work was carried out in compliance with the code. On May 10, 1996, Mr. Margotta met with Water Scott, the Regional Associate Architect of the New York Codes Bureau, to clarify the provisions of the Fire Prevention and Building Code as applied to a take-out food business such as Chester Chicken. In a follow-up letter to Mr. Margotta, Mr. Scott noted that the Code required the installation of either a code-conforming fire-resistant separation between the kitchen and customer area or a code-conforming sprinkler system.

On May 24, 1996, plaintiff and Mr. Jiminez made their first application for a building permit at 166 Cortlandt. A building permit allows the holder to carry out planned changes to a structure; occupancy or operation of the site is permitted only upon issuance of a Certificate of Occupancy (CO). The building permit for Chester Chicken was approved by Mr. Margotta on June 4, 1996. On June 5, 1996, Mr. Rodriguez applied to the New York Department of State for a variance to the fire code requirement of the installation of either a fire separator or a sprinkler. The owner, Mr. Ianerelli, filed an objection to Mr. Rodriguez's application for the variance, due to the fact that the building was old and of wood frame construction. On July 12, 1996, Mr. Margotta performed an inspection of the kitchen in the presence of the project architect, Mr. McCarthy. Mr. McCarthy wrote to Mr. Rodriguez recommending that Mr. Rodriguez correct the problems with the kitchen in accordance with his revised plans and that he notify the Building Department for a future inspection. In August, the Department of State held a hearing on the variance matter; the request for variance was denied on September 26, 1996.

In December 1996, Mr. Rodriguez applied for a CO. On December 18, 1996, Mr. Margotta informed Mr. Rodriguez that the CO would be issued after several remaining problems were corrected. The CO was issued on January 30, 1997. Mr. Rodriguez operated Chester Chicken and earned a profit of approximately $2,000 a week until he sold his interest in the restaurant to Luis Muniz in November 1997.

*Electrical Violations: Prosecution by the Village*

In June 1997, the Village brought charges against Mr. Rodriguez in connection with his tenancy at 169 Cortlandt for 1) maintaining an electrical wiring system with voltage in excess of 50 volts in violation of Village Code 18–2; 2) altering the equipment used for the distribution of electricity without a prior permit from the Building Inspector in violation of Village Code 18–12; 3) engaging in the business of electrical contracting within the village without registering with the Village Clerk in violation of Village Code 18–19.; and 4) turning on or restoring electrical current without prior inspection of the premises, in violation of Village Code § 18–9. The charges were brought following a complaint by the owner, Mr. Iannerelli, to Mr. Margotta. Mr. Margotta inspected the wiring in question and found it to be hot to the touch. A further inspection was made by the village electrical inspector, Mr. Marabito, who confirmed Mr. Margotta's findings.

A full evidentiary hearing was held, at which plaintiff was represented by counsel. The court found Mr. Rodriguez guilty of charges 1, 2, and 4. Mr. Rodriguez was found not guilty of charge 3. He was fined $50 for each of the guilty charges. Shortly before the decision was rendered by the Village Court, the plaintiff filed a Notice of Claim against the defendants which served as the prerequisite to the filing of this action. (This action was filed on February 19, 1998.)

### 85–87 Cortlandt

The apartment building at 85–87 Cortlandt was constructed in the late 19th Century and has a long history of structural problems. In 1990, when the building was in imminent danger of collapse, Mr. Margotta declared the building unfit for human habitation; the Village ordered the then owner to vacate the tenants of the building and immediately shore up the building. Problems with code compliance continued throughout the early 1990s. In May 1998, plaintiff and Mr. Jiminez purchased the building under the name "Biombo, Inc.," with the intent to renovate portions of it. They engaged the services of Ron Turnquist, a local architect, to draw up plans for the renovation. On May 29, 1998, Mr. Turnquist filed an application for a building permit with Mr. Margotta. On June 2, 1998, Mr. Margotta informed Mr. Turnquist that a building permit would not be issued until 1) a complete set of plans for the building was prepared, and 2) Mr. Turnquist completed exploratory work concerning the structural defects in the building that had been uncovered by earlier engineering reports (reports which Mr. Margotta made available to Mr. Turnquist).

Upon visiting the site on June 28, 1998, Mr. Margotta discovered that Mr. Rodriguez and three other men were installing flooring at the building in violation of the building permit requirement. At a later date, and after discussions with Mr. Turnquist about the building permit, Mr. Margotta agreed that he could approve the plans for a "piecemeal," rather than a complete, renovation. As is standard in renovations to older buildings, plaintiff and his father-in-law were required to seek approval of the Architectural Review Board (ARB) for approval of stucco work on the facade of the building. The ARB approved plaintiff's plans. Plaintiff has also received approval from the Village for the construction of a meat market on the ground floor of the site.

### 110 Beekman Avenue: The "Gatell" Job

In the fall of 1997, Mr. Rodriguez was retained by the Gatells to perform clean-up and substantial renovation work at the Gatells' premises. Village Plumbing Inspector Gary McLean performed an unannounced inspection at the work site on May 2, 1998. The plaintiff initially refused entry to Mr. McLean. Mr. McLean called the Village Police Chief, who arrived on the scene to support Mr. McLean's claim to right of entry. (The Police Chief had, in fact, conferred with the Village Attorney to confirm that Mr. McLean had the right to inspect the premises.) Mr. McLean inspected the work site. There is some dispute as to whether Mr. McLean immediately informed Plaintiff that the use of non-conforming PVC pipe at the project was a violation of the state building code. In any event, on November 2, 1998, some six months after the spot inspection, Mr. Gatell was informed by both Mr. Margotta and Mr., McLean that a final plumbing inspection was necessary before the issuance of a CO. Plaintiff was informed in writing on November 3, 1998, that the PVC violated the state building code. Shortly thereafter, the Gatells terminated Plaintiff form the project based on their dissatisfaction with the quality of his work. Plaintiff was paid $400,000 for the work he had performed on the site up to that date.

### 139 and 160 Cortlandt Street

At 139 Cortlandt, Mr. Rodriguez and Mr. Jiminez applied for site plan approval to construct a new building with six apartments and two retail stores. The new

construction required extensive review by the Village Planning Board. Site plan approval was issued by the Board, subject to several requirements, including the demolition of the existing structure on the property and the creation of an easement for parking spaces on the property. These requirements were based on the reports of independent consultants. The Village Fire Department also reviewed the proposed site plans for 139 Cortlandt and concurred in the recommendation that the existing structure be demolished prior to commencement of the new construction.

At 160 Cortlandt Street, Mr. Rodriguez performed contracting work at this building owned by Luis Muniz. During the course of his work, Mr. Margotta and Mr. McLean, the Village Plumbing Inspector, inspected the site from five to ten times. Non-conforming insulation was requested to be removed. Mr. Rodriguez alleges that the removal of the non-conforming insulation cost him $6,000.00. He does not dispute that the different type of insulation was a requirement of the state code.

*Alleged Racial Slurs against Mr. Rodriguez*

Mr. Rodriguez alleges that Mr. Margotta's actions to enforce the building codes against Mr. Rodriguez were motivated by personal and racial animus. In support of this claim, two witnesses testified that they heard Mr. Margotta, on one occasion, refer to Rodriguez as a "spic." Also, Mr. Rodriguez alleges that on one occasion Mr. Margotta proclaimed "You guys are all full of shit," at a work site where he was discussing the disposal of asbestos with a group of construction workers; Mr. Rodriguez concluded that Mr. Margotta could only have meant that all Hispanics are "full of shit" because only Hispanic men were present. In addition, one witness testified that he has also heard Larry McLean, the plumbing inspector, refer to Mr. Rodriguez as a "spic" on several occasions. Several witnesses also testified to the fact that there is personal tension between Mr. Margotta and the plaintiff.

*Standards for Summary Judgment*

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*Selective Enforcement Claim: Fourteenth Amendment*

The Plaintiff does not dispute that Mr. Margotta is charged with enforcing the local and state building codes as they apply to construction projects in Sleepy Hollow. Nor does plaintiff dispute that the building codes apply to him in his capacities as a building contractor, tenant, and property owner in the village. The fact that Mr. Rodriguez is the busiest building contractor in the Village is also undisputed. The fact that Mr. Rodriguez has been guilty of criminal violations of the local building ordinances is a matter of public record. (*See* Margotta Aff.Ex. R.). It is also undisputed in the record that Mr. Rodriguez has been in violation of local, state and national building codes and standards on numerous occasions at several of his work sites in the village.

The Plaintiff also does not allege that he has ever been permanently denied any permits or certificates by Mr. Margotta or the Village. Rather, Plaintiff claims that Mr. Margotta singled him out for enforce-

ment of the codes in a manner different from his treatment of other building contractors.

A claim of selective enforcement in violation of equal protection arises where:

(1) the person, compared with others similarly situated, was selectively treated; *and*

(2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious bad faith intent to injure a person. *LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994) (citing *LeClair v. Saunders,* 627 F.2d 606 (2d Cir.1980)).

■ Under the first prong, the question is whether there is any evidence from which it could be inferred that Mr. Margotta treated similarly situated non-Hispanic contractors differently. Mr. Rodriguez fails to provide any evidence that could lead a jury to conclude that Mr. Margotta enforced the building code requirements against Mr. Rodriguez and not against other, non-Hispanic building contractors in Sleepy Hollow. Indeed, the evidence provided by the Plaintiff himself merely points to the fact that other contractors—Hispanic and non-Hispanic alike—have had to deal with Mr, Margotta's office in obtaining the same permits, certificates and variances for which Mr. Rodriguez complains he has been singled out. (Miranda Decl.Ex. F at p. 13). Plaintiff's own architect testified that as Building Inspector, Mr, Margotta scrutinized all the construction projects in the village. *Id.* (Miranda Decl.Ex. G: Turnquist Dep. at pp. 68–69). During the years 1997 and 1998, the record indicates that Mr. Margotta inspected 186 different construction sites in the village; that he cited violations in approximately one-third of the inspections. (Margotta Aff.Ex. AP).

Mr. Rodriguez's plumber on the Chester Chicken site testified that Mr. Margotta and other village representatives intended to "make an example" out of Mr. Rodriguez in connection with his violations of the Village electrical code (Tompkins Dep. at p. 13). There is no evidence from which it can be inferred, however, that Mr. Margotta's vigorous prosecution of Mr. Rodriguez's numerous violations of the building codes, or his close scrutiny of Mr. Rodriguez's building projects were any different from his oversight of projects in the Village being carried out by other contractors. On the contrary, the evidence points to a pattern of close oversight and vigorous prosecutions—including criminal prosecutions—of code compliance at different construction sites in the village, including those of non-Hispanic contractors. (*See* Miranda Reply Dec.Ex. E) The evidence shows that Mr. Margotta is aggressive in carrying out his responsibilities and that he has frequently clashed and argued with local architects and building contractors over the years. (Margotta Aff.Ex. AC; Turnquist Dep. at pp. 147–149; McCarthy Dep. at pp. 67–69.)

The opinion of Village Justice John Lewis in response to Mr. Rodriguez's selective prosecution claim at the hearing of his criminal violation of the electricity codes addressed this point:

"Defendant makes unsupported assumptions about this Court's own 'docket' (i.e., that the Court generally seeks only compliance and not criminal sanctions in [building] code cases) which are not credited by the Court. The undersigned has been Village Justice for six months (*during which other code violators, of non-Hispanic ethnicities, have in fact been vigorously prosecuted* ) ..." (Margotta Aff.Ex. R at p. 10) (emphasis added).

While Judge Lewis' opinion in this regard is inadmissable hearsay, and is not relied on by the Court (only the absence of any evidence of selective enforcement is relied on), I cite it to demonstrate that a sister court heard the same arguments and dismissed them as specious.

There is thus no evidence in the record that could lead a jury to conclude that Mr. Margotta's treatment of Rodriguez or his adversarial relationship with Rodriguez reflects anything other than the usual and predictable tension between a regulator and the business being regulated. Drawing all inferences from the evidence in favor of the Plaintiff, it could be said that the relationship between Mr. Margotta and Mr. Rodriguez is one of intense mutual dislike. (Muniz Dep. pp. 10–12, 28). Nevertheless, from the evidence in this record, no finding of disparate treatment could be made.

Because Plaintiff fails to satisfy the first prong of the two-part test, the second prong is irrelevant. However, I note that Mr. Rodriguez offers only his own speculation that Mr. Margotta is motivated by either racial or personal animus. Even Plaintiff's own architects testified that the personal animosity between Margotta and Rodriguez is a result of the natural tension between contractors and building inspectors, not racial animus. (McCarthy Dep. pp. 67–69). Building inspectors seek to enforce the code, regardless of costs; contractors look to get the job done at the lowest possible cost. *Id.* In a selective enforcement claim, mere "conjecture and speculation" are insufficient to withstand defendant's motion for summary judgment. *Lisa's Party City v. Town of Henrietta,* 185 F.3d 12 (2d Cir.1999) (citing *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998)).

*Substantive Due Process Claims*

█ Plaintiff's argument that unannounced building inspections constitute a violation of his Fourth Amendment and substantive due process rights has no basis in law. In order to prevail on a substantive due process claim under § 1983, Plaintiff must (1) demonstrate that he has a constitutionally protected property right in the government benefit at issue; (2) suffer a deprivation of that right as a result of government action; and (3) prove that he was deprived of that right without due process of law. *Greene v. Town of Blooming Grove,* 935 F.2d 507, 509–510 (2d Cir. 1991).

█ In a recent case, the Second Circuit held that there is no protected property right in the procedures relating to obtaining building inspections or in the procedures themselves:

> The mere existence of procedures for obtaining a permit or certificate do not, in and of themselves, create constitutional property interests. Were we to hold otherwise, aggrieved property owners would be empowered to bring constitutional challenges at virtually every stage of the building process in municipalities. We expressly decline to announce a rule that would obligate federal courts to consider endless numbers of alleged property interests arising not from the benefits themselves, but as extensions of existing or sought property interests. *Zahra v. Town of Southold,* 48 F.3d 674, 682 (2d Cir.1995).

Plaintiff therefore had no property right to the inspections in question. Furthermore, on the evidence, the Plaintiff has suffered no deprivation. All the permits and certificates of occupancy he requested were granted, once compliance with the village and state codes had been shown.

█ Plaintiff's claim that a "liberty interest" is implicated by the refusal to grant a building permit where a contractor has not complied with the law is similarly without merit. There is simply no "liberty interest" under the Fourteenth Amendment that would be adversely affected by the requirement that Plaintiff carry out construction work in accordance with a law applied equally to all contractors in the Village. It is well settled that one must have no ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest. *Bernard v. United Township High School Dist. No. 30,* 5 F.3d 1090 (7th Cir.1993); *LaTessa v. New Jersey Racing Commission,* 113 F.3d 1313, 1318 (3d Cir.1997). *Cf. Valmonte v.*

*Bane,* 18 F.3d 992, (2d Cir.1994). Here, the Plaintiff's claim of a liberty interest is not cognizable since the evidence is undisputed that he has at all times continued to do business in Sleepy Hollow.

*Procedural Due Process Claim under "Stigma Plus"*

■ Plaintiff further alleges that Margotta defamed him, causing injury to his livelihood when he told Mr. Nabil Sayegh that Rodriguez would only do a "patch-up job" on Mr. Sayegh's proposed construction project. (Stevens Aff., Ex. 83, pp. 34–36). After his conversation with Mr. Margotta, Sayegh decided not to hire Mr. Rodriguez to perform the work on his building. *Id.* Plaintiff's pleadings attempt to transform this state defamation claim into a procedural due process claim by arguing that Mr. Margotta's criticism of Mr. Rodriguez's abilities as a contractor caused Mr. Rodriguez to suffer a loss of business thus depriving him of a cognizable liberty interest.

■ Under the "stigma plus" test applied by the Supreme Court in § 1983 cases, damage to a person's reputation is not "by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In order to make a claim that defamation implicated a plaintiff's liberty interest, "loss of reputation must be coupled with some other tangible element." *Valmonte,* 18 F.3d 992, 999 (*citing Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405).

Even assuming that Mr. Margotta's alleged statement to Mr. Sayegh was defamatory, Plaintiff has failed to provide any evidence of the "plus." Mr. Rodriguez has shown no harm to his carrying out business in Sleepy Hollow. By his own testimony as well as the testimony of his own architect, Mr. Rodriguez is the "busiest contractor in Sleepy Hollow." (Margotta Aff.Ex. AC: Turnquist Dep. at p. 156). It is thus not necessary to reach the question of whether Mr. Margotta's statements constituted privileged opinion.

*First Amendment Political Retaliation Claim*

■ Plaintiff has presented no evidence in support of the allegation of retaliation on the basis of either Plaintiff's speech or political association. The legal standard requires plaintiff to show how that defendant's actions and/or statements have impaired plaintiff's rights under the First Amendment. *See Spear v. Town of West Hartford,* 954 F.2d 63, 67 (2d Cir.1992). Allegations of a subjective chilling of First Amendment rights "are not an adequate substitute for a claim of specific present objective harm or a threat of a specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Plaintiff's allegation of political retaliation is not even logical: In February 1996, the time frame in which he claims the town Republicans retaliated against him for his posting of a sign supporting a Democratic candidate, the Republicans were not in power in the Village, and therefore could not retaliate against Plaintiff.

*Claim Against the Village of Sleepy Hollow*

■ The claim against defendant Village of Sleepy Hollow's is dismissed as a matter of law. To prevail at summary judgment on a § 1983 claim, plaintiff must show that the Village has a policy or custom which cause the deprivation of his civil rights. *See City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Under § 1983, a municipality cannot be held liable solely on a theory of *respondeat superior* liability. *Monell v. Department of Social Services,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff must demonstrate "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. at 385, 109 S.Ct. 1197. Plaintiff

must show that the municipal policy was the "moving force [behind] the constitutional violation." *City of Canton v. Harris,* 489 U.S. at 389, 109 S.Ct. 1197 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018 and *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)). "The mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Zahra v. Town of Southold,* 48 F.3d 674, 685 (1995) (Quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)).

 Plaintiff does not present any evidence addressing municipal policy or custom in support of his claim. Furthermore, plaintiff has not presented any evidence of anti-Hispanic animus on the part of the Village. The fact that Hispanics—including the plaintiff's father-in-law—have served on the ZBA and that one currently serves on the Village Board of Trustees are evidence pointing to the contrary conclusion. The evidence further shows that Mr. Margotta's decisions have, on occasion, been overruled by the ZBA.

 Plaintiff's alternative argument that Margotta, as a part-time building inspector, serves as a policymaker in the Village is similarly without merit. Mr. Margotta is not empowered to write the building code, set policy for enforcement of the code, or to bring about prosecutions under the code. The Planning Board and the ZBA are, for the purposes of the building code, the policy makers in the Village, and, as noted earlier, there is no evidence presented to suggest that either of these entities has acted with animus toward the Plaintiff.

## Qualified Immunity

Because plaintiff has failed to make a showing of harm sufficient to overcome summary judgment, it is not necessary to reach the question of whether Mr. Margotta may be entitled to qualified immunity.

## State Defamation Claim

Plaintiff alleges in his complaint that defendant Margotta and Plumbing Inspector McLean (who is not a named defendant in this action) defamed him when he discouraged third parties from using his services as a contractor. This state claim of defamation is insufficient because it lacks of specificity and for failure to allege financial harm. Under New York law, plaintiff must allege the time, manner and person to whom publication of the defamatory remarks were made. *Geddes v. Princess Properties,* 88 A.D.2d 835, 451 N.Y.S.2d 150 (1st Dep't 1982). Furthermore, the exact words of the defamation must be spelled out in the complaint. *See* N.Y.C.P.L.R. § 3016(a). Neither of these two threshold requirements are met. However, in order to dismiss on this ground, I would be required to grant Plaintiff leave to replead to cure this defect. *See* N.Y.C.P.L.R. §§ 3014, 3025(b). As I am not prepared to entertain a state claim where there is no basis of federal jurisdiction, I elect to dismiss on the ground that I lack jurisdiction. It is thus not necessary to reach whether Mr. Margotta's statements were privileged opinion.

## Conclusion

Because there are no questions of material fact from which a reasonable jury could find for Plaintiff on any of his claims, summary judgment is granted in favor of defendants Margotta and the Village of Sleepy Hollow.

This constitutes the decision and order of this Court.