Marie A. CARLUCCI, Plaintiff,

v.

Margaret KALSCHED, individually, James Brody, individually, Cheryl Gainer, individually, and the Westchester County Health Care Corporation, Defendants.

No. 99CIV.1643(CM).

United States District Court, S.D. New York.

Jan. 4, 2000.

Gerald J. O'Hara, Lovett & Gould, White Plains, NY, for the Plaintiff.

Robin D. Fessel, Sullivan & Cromwell, New York City, for James Brody, Cheryl Gainer, Westchester County Health Care Corporation, Defendants.

Edward Cerasia II, Simone A. Pam, Seyfarth, Shaw, Fairweather & Geraldson, New York City, for Margaret Kalsched, Defendant.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S CLAIMS

McMAHON, District Judge.

This memorandum memorializes a decision announced in open court on December 18, 1999.

*Summary*

Plaintiff Marie Carlucci, a nurse, brings suit here under 42 U.S.C. § 1983 against her former employer, Westchester County Health Care Corporation (WCHCC), her former supervisor, Margaret Kalsched, an employee of contractor Amsterdam Services Corporation, and James Brody and Cheryl Gainer, both employees of WCHCC. Her claims arise out of an investigation following the death of a patient at the WCHCC long-term care facility, the Taylor Care Center. Carlucci claims that Defendants: (1) impermissibly chilled her First Amendment right to speech; (2) retaliated against her for exercising her First Amendment rights; and (3) violated her "right to petition the government for redress of grievances." She has joined a state claim against Brody, Gainer and

WCHCC under New York Labor Law § 740.

Kalsched moves for summary judgment as to all claims pending against her on the basis that she is not a state actor for purposes of § 1983. Kalsched argues in the alternative that the claims should be dismissed because Carlucci has presented no evidence that she was deprived of any constitutional rights and that Kalsched, in any event, is qualifiedly immune from suit. Defendants WCHCC, Brody and Gainer together move for summary judgment on all claims against them on the basis that Plaintiff has failed to demonstrate any deprivation of her constitutional rights, and in the alternative, that Brody and Gainer are qualifiedly immune from suit. In addition, WCHCC argues that Carlucci has failed to state a claim for municipal liability under § 1983. WCHCC, Brody and Gainer also move to dismiss Plaintiff's state claim under New York Labor Law § 740.

For the reasons stated below, summary judgment is granted to all defendants on all federal claims. Plaintiff's claim under New York Labor law § 740 is dismissed without prejudice.

*Background*

The following are the facts viewed in the light most favorable to the Plaintiff:

Westchester County Health Care Corporation ("WCHCC") is a public benefit corporation created to provide health and medical services to the residents of Westchester County. *See* N.Y. Pub. Authorities Law § 3301 (McKinney's 1997). Taylor Care Center ("Taylor Care") is a long-term care facility of the WCHCC. Amsterdam Services Corporation is a private entity that provides administrative services to Taylor Care pursuant to an independent contractual agreement between it and WCHCC. Margaret Kalsched, the Administrator of the Center, is an employee of Amsterdam Services Corporation. She performs her duties as Administrator pursuant to Amsterdam Services' contract with WCHCC.

James Brody is the Director of Respiratory Therapy at WCHCC with responsibility for, *inter alia*, respiratory therapy at Taylor Care. Cheryl Gainer is Executive Vice President and Chief Operating Officer of WCHCC.

Plaintiff Marie Carlucci was employed on a provisional basis by WCHCC at its Taylor Care Center in December 1997 as Deputy Director of Nursing. She reported directly to Doreen Jackson, Director of Nursing (not a party to this litigation), who in turn reported to Defendant Margaret Kalsched. Kalsched did not have the power to hire, fire, demote or discipline Carlucci, or make any decision that would adversely affect her pay or rank. As part of her nursing and management duties, Carlucci was responsible for investigating incidents, accidents and allegations of abuse, mistreatment, neglect and negligence at the center. She stopped working at Taylor Care on August 28, 1998, but she remains a WCHCC employee. (Carlucci Dep. at 528). In January 1999, WCHCC offered Plaintiff the Deputy Director position on a non-provisional basis. (Fessel Decl. Exh. D).

On July 12, 1998, a seriously ill, ventilator-dependent patient at Taylor Care died somewhat unexpectedly as a result of a disconnected "LP–20" ventilator. At the time the patient was found dead, the ventilator alarm did not sound, as it would in a properly functioning ventilator. On July 13, 1998, in response to the fact that the alarm did not sound, WCHCC undertook to investigate the death. Plaintiff was responsible for the investigation internal to Taylor Care. Certain facts surrounding the patient's death led the Plaintiff to conclude that the death was a result of negligence. Plaintiff discovered, for example, that the use of wrist restraints on the patient was not properly documented and that normal procedures used for deciding how and when to use the restraints were not followed. She was also concerned about

alarm failures on prior occasions when the "LP–20s" disconnected.

On July 14, Carlucci completed a handwritten preliminary investigation report in which she concluded that the death resulted from negligence. She submitted the report to Kalsched. Although she was not "happy" about the determination of negligence, Kalsched signed the initial report. After speaking with other staff members later that same day, however, Kalsched formed the opinion that the death might not have been the result of negligence. Kalsched held a meeting about the investigation that same afternoon, at which Carlucci suggested that Taylor Care immediately inform the New York Department of Health (DOH) concerning the circumstances of the patient's death. Kalsched responded that the Taylor Center was well within the 48–hour deadline for DOH notification (a clock which had began to run at the time Carlucci was notified that there was any problem surrounding the patient's death), and that she preferred to wait until the 15th to inform DOH.

On July 15, Carlucci informed DOH of the patient death based on her view that if she did not do so, DOH might not ever be informed of the death. (Carlucci Dep. at 80). That same day, a meeting was held of all the supervisory staff, at which Gainer, Kalsched, Brody and Carlucci were present, along with the head of WCHCC's risk management department. Gainer instructed those present at the meeting not to disclose prior incidents of ventilator disconnections and alarm failures at Taylor Care to DOH. At the meeting, Carlucci expressed her concerns about the disconnections and alarm failures on the "LP–20" ventilators. Later that day, Kalsched went to Plaintiff's office and demanded that she edit her typed version of the incident report to remove the determination of "negligence" and insert instead a determination of "inconclusive."

Also on July 15, WCHCC notified the New York DOH that the patient had been found with a disconnected ventilator and that the ventilator might not have been alarmed. At the same time, WCHCC informed the patient's family that the DOH had been notified and that WCHCC had initiated an investigation into a possible ventilator alarm failure. It did not inform the family of prior disconnects or alarm failures. The Department of Health forwarded WCHCC's report to the New York State Attorney General's office, which began its own investigation. (Fessel Decl. Exh. L.)

On July 16, Kalsched approached Carlucci again with orders to make changes in the report, to indicate that the failure to alarm was the cause of the patient's death. (Carlucci Dep. at 121). A biomedical report was completed that same day, which determined that the "LP–20" ventilator was defective. (O'Hara Ex. 19).

On July 17, 1998, WCHCC submitted a preliminary report to the Department of Health, indicating that no determination with respect to the death had yet been reached, and that WCHCC's investigation was ongoing. (Fessel Decl. Exh. E.) On August 6, 1998, WCHCC submitted a "Root Cause Analysis" to the Department of Health, in which it set forth in detail the results of the investigation up to that date. It also described several measures that WCHCC had implemented to provide greater safety for Taylor Care residents, including, for example, installation of pulse oximeters that trigger an alarm when blood oxygen levels become too low.

Beginning on July 17, investigators from DOH and the Attorney General's office visited Taylor Care to conduct an on-site investigation into the July 12 death. According to Plaintiff, Kalsched, through hand gestures and body language, made it clear that she did not want Plaintiff cooperating with the investigators. Nevertheless, Plaintiff did cooperate, including providing the investigators with documents relevant to the patient death. Plaintiff had also been in touch with the investigators on several occasions prior to their on-

site investigation. For example, on July 20, 1998, Carlucci notified the Attorney General Medicaid Fraud Unit of her concerns for patient safety and her concern for the safety of other patients at facilities using the "LP–20." She testified that she told both the AG and DOH "everything" she knew or had come to believe about the death.

In the third week of July, as a result of eliminating one of the day supervisors, Carlucci's job duties were increased. No one formally disciplined her after the AG investigation; no one fired her; no one transferred her to a lesser job or took away any of the benefits of her job.

On one occasion in August, 1998, Carlucci inquired about some blood oximeters to Defendant Brody. In response, Brody got upset, flailed his arms around and said "I'm doing the best I can." This incident caused Plaintiff to get "really scared" and experience heart palpitations. Because of the palpitations, she felt physically unable to return to work at Taylor Care. She states that the conditions at Taylor Care made it impossible for her to continue in her job, and that she was thus forced to leave. Plaintiff has not returned to work at Taylor Care since August 28, 1998. WCHCC still maintains her as an employee, but Plaintiff has, in the meantime, moved to Florida.

*Standard for Summary Judgment*

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party

must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because the record before this Court is devoid of any evidence from which a reasonable jury could find in favor of the Plaintiff on any of her claims, summary judgment is granted to Defendants and Plaintiff's claims are dismissed.

*Kalsched Was Not a State Actor for Purposes of Section 1983*

In order to prevail in any claim against Kalsched under § 1983, Plaintiff must first show that Kalsched, a private party, was "acting under color of state law" at the time she allegedly violated Plaintiff's constitutional rights. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 527 (2d Cir.1996). A private individual can be held liable under § 1983 "only as a 'willful participant in joint activity with the State or its agents.'" *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir.)(quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), *cert. denied*, 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992). "Actions by a private party are deemed state action if 'there is a sufficiently close nexus between the State and the challenged action' that the actions by the private parties 'may be fairly treated as that of the State itself.'" *Chan v. City of New York*, 1 F.3d 96, 106 (2d Cir.) (citation omitted), *cert. denied sub nom.* 510 U.S. 978, 114 S.Ct. 472, 126 L.Ed.2d 423 (1993). "The purpose of [the close-nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Id.* (emphasis in original; citations omitted).

The Supreme Court has established three tests to determine whether a private

person is deemed to be a "state actor" for purposes of § 1983:(1) the public function test, *Atkins*, 487 U.S. at 49–50, 108 S.Ct. 2250; (2) the state compulsion test, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); and (3) the symbiotic relationship or nexus test, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Plaintiff fails to establish that Kalsched is a state actor under any of these three tests.

■ In order to make out a claim of state action under the "public function" test, Carlucci must show that Kalsched's function as Administrator of Taylor Care is " 'traditionally the *exclusive* prerogative of the State.' " *Rendell–Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)(emphasis in original; citation omitted). Administration of a long-term care facility is not traditionally an *exclusive prerogative* of the state. *See Blum v. Yaretsky*, 457 U.S. 991, 1012, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)(decisions made in the day-to-day administration of a nursing home are not traditional and exclusive prerogative of the State). Plaintiff thus fails to meet the "public function" test.

■■ To prevail under the "state compulsion" test, Plaintiff must show that the state actor "exercised coercive power or . . . provides such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777. (citations omitted). Plaintiff fails to allege, much less provides any evidence, that the WCHCC engaged in coercive conduct over Kalsched or her activities during the investigation of the patient death. Plaintiff thus fails to meet the requirements of the "state compulsion" test.

■ To prevail under the "symbiotic relationship" test, Plaintiff must show that "[t]he State has so far insinuated itself into a position of interdependence with [Kalsched] . . . that it must be recognized as a joint participant in the challenged activity." *Burton*, 365 U.S. at 725, 81 S.Ct. 856. Although Kalsched is an independent contractor, her activities as Administrator of Taylor Care require constant interaction with WCHCC. Nevertheless, Plaintiff must show that state was, through the interdependence of Kalsched's position and WCHCC management, a "joint participant" in the activities being challenged—i.e., Kalsched's alleged attempts to chill Plaintiff's speech and her alleged retaliatory actions.

In *Sherlock v. Montefiore*, 84 F.3d 522 (2d Cir.1996) the Second Circuit affirmed the district court's grant of summary judgment for defendant on the grounds that the plaintiff had failed to allege "state action" by a state contractor. There, the defendant was an independent contractor providing medical services at the Rikers Island Correctional Facility. The plaintiff had been hired by defendant to provide counseling services. She sued under § 1983 for wrongful termination. In holding that the plaintiff's claim was properly dismissed for failing to allege state action, the Second Circuit noted:

> The fact that a municipality is responsible for providing medical attention to persons held in its custody may make an independent contractor rendering such services a state actor within the meaning of § 1983 with respect to the services so provided, *see e.g., West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), but that fact does not make the contractor a state actor with respect to its employment decisions, *see e.g., Rendell–Baker v. Kohn*, 457 U.S. 830, 840–43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Wolotsky v. Huhn*, 960 F.2d 1331, 1335–36 (6th Cir.1992). *Sherlock*, 84 F.3d at 527.

■ Carlucci is suing Kalsched over actions taken with respect to Carlucci's employment at Taylor Care. (Compl.¶ 31). It is undisputed that Kalsched is a private party employed by Amsterdam, a private

independent contractor, and that she was providing services pursuant to Amsterdam's contract with WCHCC. While Amsterdam can be considered a "state actor" for the purposes of the services it provides to Taylor Care, that conclusion does not make Kalsched a state actor for the purposes of the alleged retaliatory employment actions concerning Carlucci. In fact, because Plaintiff does not dispute that Kalsched was not empowered to hire, fire or demote her, she herself does not even begin to make out a claim that Kalsched's actions toward her were the actions of WCHCC. As a matter of law, Plaintiff has failed to make a claim—under any of the three tests—that Kalsched, a private entity, was a state actor for purposes of the Section 1983 claim. Plaintiff therefore cannot maintain a Section 1983 action against her, and all claims against Kalsched are dismissed.

*Plaintiff's Claims against Brody and Gainer Must Be Dismissed*

(1) *Plaintiff's Speech was not "Chilled"*

Plaintiff argues that her conversations with investigators from the New York Department of Health and Attorney General's office were protected speech under the First Amendment because they dealt with a matter of public concern. She alleges that as a result of these conversations and submissions—and the fact that Kalsched, Gainer and Brody disagreed with her opinion about the patient death—her speech was "chilled" and she suffered from retaliation.

■■■■■ "Persons do not relinquish their first amendment rights to comment on matters of public interest by becoming public employees." *Piesco v. City of New York, Dep't of Personnel*, 933 F.2d 1149, 1155 (2d Cir.1991). Carlucci's speech falls under First Amendment protection because it was on "a matter of public concern." *See Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). A determination of whether the speech is of "public concern" is made by the court, and is "determined by the content, form, and context of a given statement as revealed by the whole records." *Id.* at 147–48, 103 S.Ct. 1684.

■■■■ Any suggestion that Carlucci's speech was on a routine internal matter and thus not protected speech is without merit. The record clearly indicates that Carlucci spoke to state investigators outside the normal channels because of her stated concerns about the safety of patients and any members of the public who might come under the medical care of WCHCC. Carlucci also noted to the inspectors that she was concerned about a "cover up" of the patient death—a fact which puts her speech squarely within the public speech category and out of the realm of internal office affairs. Carlucci was entitled to comment on her opinions concerning the death, at least insofar as those opinions went beyond the internal practices of Taylor Care to include her concern about real dangers posed to the general public and the cover-up of an important public health issue. *See, e.g., Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)(weighing the interest of a citizen's right to express opinions on matters of public concern against the interest of a public employer in the efficient administration of services).

■■■■ Having accepted Plaintiff's argument that the safety of patients at a public healthcare facility is a matter of public concern protected under the First Amendment, Plaintiff's claim that her speech was "chilled" nonetheless fails. By Plaintiff's own admission, she told the state agencies involved in the investigation "everything" she knew or had come to believe about the patient's death on July 12. Plaintiff's submissions to this court admit that she "expressed her concern to her superiors and state agencies that the failure to alarm (as well as other issues of insufficient care ...) presented a great risk of harm and even death to patients at Taylor Care Cen-

ter as well as the general public." (Plaintiff's Opposition Brief at 5.) It is, in fact, undisputed that Plaintiff was vocal about her concerns, that she stated them repeatedly, and, what is most relevant to her claim here, that she expressed these concerns to the Department of Health and Attorney General investigators. Plaintiff "continued her advocacy for the safety of the patients," and "also expressed her concern to state agencies, including the Department of Health and the Attorney General of the State of New York, that the Defendants were engaging in a cover-up and that they had violated [the] law and policy of the institution by failing to provide adequate treatment to the public." (*Id.*). At no time did any Defendants even slow down—much less stop—Plaintiff's ability to communicate with the investigators.

The closest Plaintiff comes to providing any evidence that anyone actually "chilled" her speech is Plaintiff's testimony that Kalsched would not allow Carlucci to close her door during her meeting with the Department of Health investigator, and stood outside her door listening to the interview, making had gestures and "prohibiting Plaintiff from fully disclosing facts to the investigator." (Carlucci Dep. at 99, 156.) During the course of that interview, whenever Carlucci left her office to make copies of documents to give to the Department of Health investigator, Kalsched was "repeatedly in [Carlucci's] face," and demanded to know what Carlucci was showing Department of Health. (*Id.*). However, Kalsched has been dismissed as a defendant, and this evidence does not support any claim against Brody or Gainer.

■ The only evidence that Gainer or Brody made any attempt to affect what Carlucci told investigators was (1) Gainer's request at the July 15 meeting that staff members not disclose prior ventilator problems to the DOH investigators and (2) Brody's presence at that same meeting. As far as Brody is concerned, Plaintiff fails to any colorable claim of "chilling" at all.

In addition, Plaintiff herself stated that, despite Gainer's request at the meeting and Gainer's alleged support of Kalsched's changed conclusions regarding the patient death, Plaintiff actively and repeatedly expressed her opinion about prior ventilator incidents to the Department of Health and the New York Attorney General's Medicaid Fraud Control Unit. (Carlucci Dep. at 161; Spellman Dep. at 5, 7, 8.) When she felt that information was being withheld from the Department of Health or the Attorney General's office, she went ahead and told the investigators from those offices. (Carlucci Dep. at 163, 380, 381.) In fact, Plaintiff admits that she told state investigators "everything" that she knew or had come to believe about the patient death, which included her concerns about the prior incidents. (Carlucci Dep. at 373–398.) Her speech was never "chilled" at any point. As Defendants properly point out, the mere subjective sense that one's speech is chilled, without evidence of actual chilling, is not enough to survive summary judgment. *See Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir.1992); *see also Rodriguez v. Margotta*, 71 F.Supp.2d 289 (S.D.N.Y.1999). Plaintiff's first and third claims that her speech was chilled and that she was prevented from telling the government of her concerns are therefore dismissed.

(2) *No Adverse Employment Action was Taken by Brody or Gainer*

■ As discussed above, the record is replete with instances of Plaintiff expressing her opinion about the cause of the death of the patient and her ongoing concerns about patient safety at Taylor Care. She claims that by exercising her right to express her views on these matters of public concern, she was subjected to retaliation. In order to prevail on a § 1983 claim premised on retaliation, the Plaintiff must establish that defendants have taken an "adverse employment action" against her. *See Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir.1994). Adverse employment

action is defined by the Supreme Court in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) to include not only actual discharge or disciplining by an employer, but also any action that affects "promotions, transfers and recalls after layoffs." 497 U.S. at 75, 110 S.Ct. 2729. *See also, Lieberman v. Reisman*, 857 F.2d 896 (2d Cir.1988)(denial of compensatory and vacation time is adverse employment action); *Bennis v. Gable*, 823 F.2d 723 (3d Cir.1987)(demotion is adverse employment action).

The evidence of retaliation consists solely of Plaintiff's own testimony—which I assume for the purposes of this motion to be true—that Kalsched "interrogated" her, scrutinized her in a way she had never experienced before, assigned her extra work, and altered her job responsibilities and duties. (Plaintiff's brief at 17; Carlucci Dep. 158). Plaintiff also testified that at some point after the investigation, Kalsched stated that Plaintiff "would see to it that [Carlucci] never word as a nurse again." (Carlucci Dep. 558). This retaliation caused Plaintiff to be:

> micro-managed, kept out of the information "loop," refused access to meetings, refused access to state agencies ... [and] prohibited from completing her investigation into the July 12, 1998 death and/or any reports with respect to investigations of ventilator alarm failures, told to withhold information from state investigators, told to erase computer data regarding her investigation ... found her office had been searched on at least two occasions, had files stolen from her office, [and was] harassed, threatened and ultimately forced to leave her employment. (Plaintiff's brief at 13).[1]

Of course, Kalsched is no longer a defendant in the action. Moreover, it is undisputed that Kalsched had no authority to take, nor did she take, any adverse employment action against Carlucci. (Kalsched L.R. 56.1 para 5–9). And to the extent that the alleged retaliation duplicates the alleged "chilling" of her speech, it is unfounded for the reason her "chilling" claims were deemed unfounded—her speech was not chilled. Carlucci was never disciplined, demoted, or fired. She never had any privileges taken away. She was never removed from the investigation into the July 12 death. In fact, Carlucci had unfettered access to all the state agencies performing an investigation of the patient's death, and her findings and conclusions were used in the production of the Root Cause Analysis that was sent to the Department of Health. (*Id.* at paras 45, 48, 57–58). Thus, it is hard to see what adverse employment action was taken against her.

Assuming *arguendo* that Carlucci received additional job duties, a change in duties is not an adverse employment action under § 1983. *See Boylan v. Arruda*, 42 F.Supp.2d 352, 354 (S.D.N.Y.1999)(to make out a claim under section 1983, plaintiff must show an adverse employment action that affected her "employment in a way that is both detrimental and substantial.") (citation omitted). Furthermore, the record indicates that the increase in job duties was not directed at Carlucci, but rather a result of across-the-board budget cuts that reduced the number of nurses on duty during a given day and increased all the nurses' workloads. (Carlucci Dep. at 315, 319).

Brody's alleged retaliatory action consisted of general nastiness and his becoming "really angry very quickly," in response to Plaintiff's inquiry about the whereabouts of pulse oximeters that she had asked for a month earlier. Brody allegedly waved his arms around and stat-

---

1. In her brief, Plaintiff also claimed—without submitting supporting evidence as an exhibit to her judgment papers—that Defendants improperly brought her before a professional ethics committee. Even if evidence of the ethics charge had been submitted, the incident would be irrelevant to Plaintiff's claim, as it occurred in October, 1998, two months after she left Taylor Care.

ed "I don't know where they are...I'm doing the best I can." (Carlucci Dep. at 214–215). Plaintiff became "really scared" as a result of this episode and began to suffer heart palpitations, which she states are the cause of her inability to return to work. Plaintiff makes only generalized complaints about Gainer's alleged retaliatory actions.

■ Mere "nastiness" of colleagues or supervisors, or unprofessional behavior, is likewise not considered adverse employment action for purposes of § 1983. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 n. 3 (2d Cir.1996)(supervisor's verbal abuse and general "nastiness" is not "an adverse employment decision or action disadvantaging her; ..."). Subjective beliefs that certain behavior is "scary" is not an adverse employment action. Thus, assuming Brody's arm waving has any significance at all, it does not rise to the level of adverse employment action.

(3) *There was No "Constructive Discharge" Amounting to Adverse Employment Action*

■ Having failed to make out a claim of actual discharge, disciplining or adverse employment action under *Rutan,* Plaintiff is left with her remaining theory that, as a result of Defendants' actions in the six weeks following the patient death, she was "constructively discharged"—the ultimate adverse employment action. She states in her brief, "If ever there was [sic] a case for constructive discharge, as set forth [by the case law], this is the one." I disagree. A constructive discharge claim requires proof that the "employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign," *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993). *See Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir.1993)(constructive discharge requires showing work conditions "so intolerable that [the plaintiff] was forced into an involuntary resig-

nation.")(quoting *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983)). This is a high threshold for Plaintiff to meet.

The "intolerable" conditions Plaintiff cites are Kalsched's verbal abuse; Brody's yelling and arm-waving; Kalsched's "menacing glares;" and allegations that she was "observed excessively," "criticized for things others did with impunity," prohibited from attending meetings, told not to give certain information to the Department of Health and Attorney General investigators and sent away to a training center on the day the Attorney General inspectors were scheduled to conduct interviews at Taylor Care. Plaintiff contends that all these activities made her physically ill and unable to return to work after August 28.

■ Again, Kalsched has been dismissed from the case already. Plaintiff says nothing about how Gainer made her life intolerable. Thus, summary judgment is granted for Gainer on this claim. And, as a matter of law, the single incident of arm-waving by Brody does not rise to the level of conditions that were so difficult or unpleasant that a "reasonable person ... would have felt compelled to resign."

■ This leaves Plaintiff's claim that conditions became stressful after she cooperated with the State investigation against her supervisors' wishes. In *Spence v. Maryland Casualty Co.,* 995 F.2d 1147 (2d Cir.1993), the Second Circuit considered whether an employee's claim of a stress-related heart condition made out a constructive discharge claim. The court there noted that:

A constructive discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health. *See, e.g., Meyer v. Brown & Root Construction Co.,* 661 F.2d 369, 371–72 (5th Cir.1981) (constructive discharge in violation of Title VII where pregnant employee transferred to position requiring heavy manu-

al labor). But an employer is entitled to insist on as high a standard of work performance as it deems appropriate, and *the fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer. Id.* at 1156. (emphasis added).

As the record stands, almost none of Plaintiff's allegations are backed up by actual evidence. In addition, Plaintiff misrepresents the record in claiming that "her own doctor and independent medical professionals hired by the County concluded that she could not physically return to work until such time as the harassing treatment ceased." (Pl.Mem.22.) The document on which plaintiff relies for that assertion says nothing of the sort. It merely restates the narrative of work-related "stress" that Carlucci alleges in this suit. In his testimony, the doctor who prepared the medical report containing Carlucci's statements about her work-related stress stated that he had no opinion—nor would he have one if called to testify—concerning the cause of Carlucci's "stress." (Kornhaber Dep. at 50.)

Perhaps most telling is Defendants' evidence—which Plaintiff fails to controvert—that all the employees at Taylor Care were under extreme stress as a result of the July 12 death, the problem with disconnecting ventilators and the resulting state investigations. In fact, Carlucci's colleague, Loretta Penn, was formally disciplined for her administrative actions in connection with the July 12 patient death. Yet none of the other employees involved felt compelled to leave. On the facts as Plaintiff presents them, no reasonable jury could infer that the conditions at Taylor Care were so intolerable during the six weeks at issue that Carlucci was forced into an involuntary resignation. Her claim

of constructive discharge thus fails as a matter of law.

This leaves Gainer. Plaintiff does not specifically identify any adverse action taken by Gainer. Thus, Plaintiff has failed to contravert Gainer's motion for summary judgment, and it must be granted.

Plaintiff's federal claims against Brody and Gainer are thus dismissed.

*Claims Against WCHCC*

▮▮▮▮ As a matter of law, WCHCC cannot be held liable under a theory of *respondeat superior. See Monell v. Dept. of Soc. Servs. of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under *Monell,* an employer can be held liable under § 1983 only if it was the "moving force" behind the wrongdoing. *Id.* at 693–694, 98 S.Ct. 2018; *Kelly v. Metro–North Commuter Railroad,* 37 F.Supp.2d 233, 236 (S.D.N.Y.1999) (citation omitted). Plaintiff's claim against WCHCC will thus fail as a matter of law unless she can show either (1) that the conduct was taken pursuant to a policy or custom of the employer or (2) that the conduct was taken by a "policymaker" and that the employer displayed deliberate indifference to the conduct. *Id.* (citing *McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)); *Murray v. Board of Ed. of the City of New York,* 984 F.Supp. 169, 181 (S.D.N.Y.1997)("Plaintiff's suing under § 1983 thus must show that a municipal defendant displayed deliberate indifference, even where the plaintiff alleges wrongdoing by a policy maker.")

▮▮▮▮ Plaintiff's contention that WCHCC had a custom or policy of infringing First Amendment rights is baseless. The only evidence supporting her allegation is her own testimony that (1) she was once told not to document a training session, and (2) Plaintiff's co-worker John Cornell, when told about an alleged direction by Gainer to withhold information from the Department of Health "laughed and stated 'well you know this is Taylor

Care.'" (Pl.Mem.30.) Assuming Plaintiff's evidence is true, it falls short of showing a custom or policy of infringing constitutional rights. In any event, Plaintiff admitted that the training session was in fact documented. (Carlucci Dep. at 83.)

Plaintiff's claim that WCHCC is liable because Kalsched, Gainer and Brody were policymakers also fails. Plaintiff's mere allegations and assertions—without any support in the record—support neither a claim that Brody and Gainer were policy makers nor a claim of WCHCC's deliberate indifference to their actions. All claims against WCHCC are therefore dismissed.

Having dismissed all of Plaintiff's federal claims, I decline to exercise supplemental jurisdiction over her state law claim against Brody, Gainer and WCHCC under § 740 of the New York State Labor Law.

This constitutes the order and decision of the court.